Erik Strindberg (Bar No. 4154)
Lauren I. Scholnick (Bar No. 7776)
Kathryn Harstad (Bar No. 11012)
Rachel E. Otto (Bar No. 12191)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Ste. 350
Salt Lake City, UT  84106
Telephone: (801) 359-4169
Facsimile: (801) 359-4313
erik@utahjobjustice.com
lauren@utahjobjustice.com
kass@utahjobjustice.com
rachel@utahjobjustice.com

John Mejia (Bar No. 13965)
Leah M. Farrell (Bar No. 13696)
**ACLU of Utah**
355 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850
jmejia@acluutah.org
lfarrell@acluutah.org

Joshua A. Block*
**ACLU LGBT Project**
125 Broad Street, Floor 18
New York, New York, 10004
Telephone: (212) 549-2593
Facsimile: (212) 549-2650
jblock@aclu.org

*Attorneys for Plaintiffs*                    *Admitted Pro hac vice*

---

# IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **JONELL EVANS, STACIA IRELAND, MARINA GOMBERG, ELENOR HEYBORNE, MATTHEW BARRAZA, TONY MILNER, DONALD JOHNSON**, and **KARL FRITZ SCHULTZ**,<br><br>Plaintiffs,<br><br>vs.<br><br>**STATE OF UTAH, GOVERNOR GARY HERBERT**, in his official capacity; and **ATTORNEY GENERAL SEAN REYES**, in his official capacity,<br><br>Defendants. | **MOTION FOR AND MEMORDAM IN SUPPORT OF PRELIMINARY INJUNCTION**<br><br><br>Case No. 2:14-cv-55DAK |

## Table of Contents

**RELIEF REQUESTED** ................................................................................................ 3

**INTRODUCTION** ..................................................................................................... 3

**FACTS** .................................................................................................................... 5

**ARGUMENT** .......................................................................................................... 16

   I.    **PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.** ............................................................................ 17

      A.    When They Solemnized Their Marriages in Accordance With Utah Law, Plaintiffs and Other Married Same-Sex Couples Immediately Acquired Vested Rights in the Recognition of their Marriages. ................................................................ 19

      B.    Under Utah's Strong Presumption Against Retroactivity, The Recognition Bans May Not Be Applied Retroactively to Marriages of Same-Sex Couples That Were Valid and Recognized at the Time They Were Entered Into. ................................ 22

      C.    Refusing to Recognize These Valid Marriages Impermissibly Violates the Due Process Clauses of the Utah and United States Constitutions. ....................... 28

   II.    **PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION DOES NOT ISSUE.** ................................................................................... 32

   III.   **THE BALANCE OF HARMS STRONGLY FAVORS PLAINTIFFS.** ................. 35

   IV.   **AN INJUNCTION IS IN THE PUBLIC INTEREST** ................................. 36

**CONCLUSION** ....................................................................................................... 37

**CERTIFICATE OF SERVICE** .................................................................................. 38

## RELIEF REQUESTED

Plaintiffs JoNell Evans, Stacia Ireland, Marina Gomberg, Elenor Heyborne, Matthew Barraza, Tony Milner, Donald Johnson, and Karl Fritz Schultz (collectively referred to as the "Plaintiffs"), by and through their undersigned attorneys, hereby move the Court for a preliminary injunction against the State of Utah, Governor Gary Herbert, and Attorney General Sean Reyes (collectively referred to as "Defendants" or the "State of Utah" or the "State") as follows:

Defendants must immediately recognize the marriages by same-sex couples entered into pursuant to Utah marriage licenses issued between December 20, 2013, and January 6, 2014, including Plaintiffs' marriages, as valid marriages and must afford all such couples and their families, including Plaintiffs, with all of the protections and responsibilities given to all married couples under Utah law.

Further, because the resolution of Plaintiffs' claims turns on an unsettled question of Utah law, Plaintiffs respectfully request that this Court act on an expedited basis to certify those questions to the Utah Supreme Court and grant a preliminary injunction pending such certification.

The Memorandum in Support of Preliminary Injunction follows.

## INTRODUCTION

Plaintiffs are four same-sex couples legally married in Utah between December 20, 2013, and January 6, 2014, the period from the day the U.S. District Court in *Kitchen v. Herbert* enjoined Utah from prohibiting same-sex couples to marry or refusing to recognize such marriages until the day that injunction was stayed pending appeal. When Plaintiffs solemnized their marriages in accordance with Utah law, they immediately obtained vested rights in the

validity and recognition of their marriages under Utah law.  Those vested rights are protected by the Due Process Clauses of the Utah and United States Constitutions and must be recognized regardless of the outcome of the *Kitchen* litigation. The State of Utah has unilaterally decided to place these valid marriages "on hold," in violation of those constitutional protections. By doing so, the State of Utah has put these couples and their families in legal limbo and prevented legally married same-sex couples from accessing critical protections for themselves and their children. Indeed, the State of Utah has already admitted in its briefing before the United States Supreme Court that refusing to recognize these marriages causes irreparable harm to same-sex couples and their families.

As discussed below, Defendants' refusal to recognize Plaintiffs' marriages, and those of other legally married same-sex couples, is not authorized by Utah law and violates the due process guarantees of the Utah Constitution and the Fourteenth Amendment.  Under Utah's strong presumption against retroactivity, statutes and constitutional amendments must be applied prospectively and may not be interpreted in a manner that impairs vested rights. The Defendants' refusal to recognize these same-marriages is impermissibly retroactive because it impairs vested rights that had already accrued before the marriage recognition bans went back into effect. Moreover, even if Defendants' decision to place these valid marriages "on hold" was not barred by the presumption against retroactivity, refusing to recognize pre-existing legal marriages violates the due process protections of the Utah and United States Constitutions.

Plaintiffs move for a preliminary injunction requiring Defendants to once again recognize their marriages.  Plaintiffs meet all of the elements required to obtain an injunction:  They are likely to prevail on the merits of their claims; will suffer irreparable harm as their lives are held in limbo if recognition of their marriages is placed "on hold"; the balance of harms favor the

Plaintiffs; and an injunction would be in the public interest. Because the resolution of Plaintiffs' claims turns on an unsettled question of Utah law, Plaintiffs respectfully request that this Court act on an expedited basis to certify those questions to the Utah Supreme Court and grant a preliminary injunction in the interim, pending certification.

## FACTS

***Utah's Marriage Statutes Regarding Same-Sex Couples***

1.      In 1977, the Utah Legislature amended Section 30-1-2 of the Utah Code to "prohibit[] and declare[] void" marriages "between persons of the same sex" (the "Marriage Limitation Statute"). In 2004, the Utah Legislature added Section 30-1-4.1 to the Utah Code, which reads "the policy of this state [is] to recognize as marriage only the legal union of a man and a woman," and "this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties [to same sex-couples] that are substantially equivalent to those provided under Utah law to a man and woman because they are married" (the "Marriage Recognition Statute").

2.      That same year the Utah Legislature passed a "Joint Resolution of Marriage" proposing to amend the Utah Constitution by adding Article I, Section 29 to read: "(1) Marriage consists of only the legal union between a man and a woman. (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect." This proposed amendment, known as Amendment 3, was on the ballot in the November 2, 2004 general election, and went into effect on January 1, 2005.[1]

***Marriages of Over 1,000 Same-Sex Couples Between December 20, 2013, and January 6, 2014***

---

[1]It was included in the Utah Constitution as Article I, Sec. 29.

3.      On December 20, 2013, the U.S. District Court in *Kitchen v. Herbert*, 2:13-cv-217 RJS, 2013 WL 6697874  (D. Utah Dec. 20, 2013), enjoined Utah from enforcing its statutory and constitutional bans on same-sex marriages and conferring legal recognition on such marriages. After the district court refused to stay enforcement of the decision pending appeal, *see Kitchen v. Herbert*, 2:13-cv-217 RJS, 2013 WL 6834634 (D. Utah Dec. 23, 2013), Governor Herbert's office sent an email to his cabinet on December 24, 2013, with the following directive: "Where no conflicting laws exist you should conduct business in compliance with the federal judge's ruling until such time that the current district court decision is addressed by the 10th Circuit Court." (Compl. Ex. B.)

4.      Also on December 24, 2013, a spokesperson for the Utah Attorney General's Office publicly stated that county clerks who did not issue licenses could be held in contempt of the court and the law. (*See* Denying same-sex marriage licenses illegal, says A.G. office, Salt Lake Trib., Dec. 24, 2013, accessible at http://www.sltrib.com/sltrib/news/57306295-78/county-sex-marriage-office.html.csp.) Later that day the U.S. Court of Appeals for the Tenth Circuit denied Governor Herbert and the acting Utah Attorney General's motion for a stay.

5.      Governor Herbert and Attorney General Reyes waited until December 31, 2013 to file a request for a stay of the district court's order with the U.S. Supreme Court, which ultimately granted a stay on January 6, 2014. *See Herbert v. Kitchen*,-- S.Ct. ----, 2014 WL 30367 (Jan. 6, 2014).  Between December 20, 2013 and January 6, 2014, the State issued marriage licenses to over 1,300 same-sex couples. (*See* Same-sex couples denied Utah marriage licenses in court order's wake, Salt Lake Trib., Jan. 6, 2014, accessible at http://www.sltrib.com/sltrib/news/57357867-78/county-marriage-couple-sex.html.csp.)While it is not known how many of those granted licenses solemnized their marriages before January 6,

2014, based on news reports, over 1,000 same-sex couples solemnized their marriages before

that date. (*Id.*) It is reported that all but seven counties in Utah issued at least one marriage

license to a same-sex couple during that period. (*Id.*)

### Utah's Decision to Withdraw Recognition from Legally Married Same-Sex Couples

6.      The Supreme Court's January 6, 2014 Order staying the *Kitchen* court's decision

did not address the legal status of the marriages that same-sex couples entered into in Utah

between December 20, 2013, and January 6, 2014. The Supreme Court stated:

> The application for stay presented to Justice Sotomayor and by her referred
> to the Court is granted.  The permanent injunction issued by the United
> States District Court for the District of Utah, case No. 2:13-cv-217, on
> December 20, 2013, is stayed pending final disposition of the appeal by the
> United States Court of Appeals for the Tenth Circuit.

(Compl. ¶ 27.)

7.      The same day that the Supreme Court issued its order, Attorney General Reyes

issued this statement: "Utah's Office of Attorney General is carefully evaluating the legal status

of the marriages that were performed since the District Court's decision and will not rush to a

decision that impacts Utah citizens so personally." (Compl. Ex. C.)

8.      A scant two days later, on January 8, 2014, Governor Herbert's chief of staff sent

an email to the Governor's cabinet instructing members to refuse to recognize the marriages of

the same-sex couples who married pursuant to Utah marriage licenses (the "Directive"). (Compl.

Ex. D.) The Directive begins by stating that soon after the December 20, 2013 injunction, "[t]his

office sent an email to each of you soon after the district court decision, directing compliance[]"

with that order. (*Id.*) The Directive explained that the Supreme Court had stayed the *Kitchen*

order and stated that "[b]ased on counsel from the Attorney General's Office regarding the Supreme Court decision, state recognition of same-sex marital status is ON HOLD until further notice." (*Id.*) The Directive then stated that its recipients should "understand this position is not intended to comment on the legal status of those same-sex marriages – that is for the courts to decide. The intent of this communication is to direct state agency compliance with current laws that prohibit the state from recognizing same-sex marriages." (*Id.*) The Directive went on to give the following instruction to state agencies:

> Wherever individuals are in the process of availing themselves of state services related to same-sex marital status, that process is on hold and will stay exactly in that position until a final court decision is issued. For example, if a same-sex married couple previously changed their names on new drivers (sic) licenses, those licenses should not be revoked. If a same-sex couple seeks to change their names on drivers (sic) licenses now, the law does not allow the state agency to recognize the marriage therefore the new drivers (sic) licenses cannot be issued.

(*Id.*)

9.      The next day, Attorney General Reyes issued a letter to county attorneys and county clerks to provide "legal clarification about whether or not to mail or otherwise provide marriage certificates to persons of the same sex whose marriage ceremonies took place between December 20, 2013 and January 6, 2014, prior to the issuance of the stay by the U.S. Supreme Court." (Compl. Ex. E.) Attorney General Reyes continued that "[a]lthough the State of Utah cannot currently legally recognize marriages other than those between a man and a woman, marriages between persons of the same sex were recognized in the state of Utah between the dates of December 20, 2013 until the stay on January 6, 2014. Based on our analysis of Utah law, the marriages were recognized at the time the ceremony was completed." (*Id.*)

10.     Attorney General Reyes further indicated that the State of Utah would not challenge the validity of those marriages for the purposes of recognition by the federal

government or other states, but "the validity of the marriages in question must ultimately be decided by the legal appeals process presently working its way through the courts[.]" (*Id.*) Attorney General Reyes also explained that "the act of completing and providing a marriage certificate for all couples whose marriage was performed prior to the morning of January 6, 2014, is administrative and consistent with Utah law" and "would allow, for instance, same-sex couples who solemnized their marriage prior to the stay to have proper documentation in states that recognize same-sex marriage." (*Id.*)

11.    On January 15, 2014, the Utah State Tax Commission issued a notice stating that same-sex couples "may file a joint return if they [were] married as of the close of the tax year[]" for 2013 because "[a]s of December 31, 2013, the Supreme Court had not yet issued its stay of the District Court's injunction." (Compl. Ex. F.) The notice further states: "This notice is limited to the 2013 tax year. Filing information for future years will be provided as court rulings and other information become available." (*Id.*)

***Plaintiffs Marina Gomberg and ElenorHeyborne***

12.    Plaintiffs Marina Gomberg and Elenor Heyborne were both born and raised in Utah.  (Gomberg Decl.¶ 1, Feb. 1, 2014, attached as Ex. A; Heyborne Decl.¶ 1, Feb. 1, 2014, attached as Ex. B.) Ms. Gomberg was raised in Ogden and Ms. Heyborne in Salt Lake City. (*Id.*[2]) Ms. Gomberg and Ms. Heyborne met nine years ago through mutual friends, and have been in a committed relationship ever since.  (*Id.*¶ 2.) Ms. Gomberg and Ms. Heyborne both work in communications and Ms. Heyborne is a State employee.  (*Id.*¶ 3.)

13.    Ms. Gomberg and Ms. Heyborne had a commitment ceremony in May 2009 but the State did not recognize their union or afford them any of the rights of married couples. (*Id.*¶

---

[2] For this section and the following sections describing the Plaintiffs, "*Id.*" refers to the corresponding numbered paragraph in the declarations of both individuals.

4.) For the last couple of years they have contemplated having a baby, but are worried about protecting their family because the State will only allow one of them to be a legal parent to any children they have together. (*Id.*¶ 5.) They had hoped being legally married would resolve this concern. (*Id.*)

14.     Within an hour of learning of the *Kitchen* decision, Ms. Gomberg and Ms. Heyborne rushed to the Salt Lake County building to obtain their marriage license and solemnized their marriage that same day. (*Id.* ¶ 6.) They were thrilled that their State was finally going to sanction their union and recognize their marriage. (*Id.*) Although they have supportive and loving family and friends, once they were legally married, Ms. Gomberg and Ms. Heyborne realized how anxious they had been in what the State considered a second-class relationship. (*Id.*¶ 7.) The disadvantageous tax status, lack of guaranteed hospital visitation, and inability to be joint legal guardians of their future children had created an enormous emotional weight, which was lifted by their legal marriage. (Gomberg Decl.¶ 7.)

15.     The State's refusal to continue to recognize their marriage again raises their concerns and anxiety. (Gomberg Decl. ¶ 8; Heyborne Decl. at ¶ 8.) Despite the fact that Ms. Gomberg and Ms. Heyborne feel disregarded and insulted by the State, it rankles them when people suggest they move elsewhere. (*Id.*¶ 9.) They are committed to Utah – they have jobs, family, and friends here. They are hoping to raise a family in the State they grew up in and continue to love. (*Id.*)

**Plaintiffs Matthew Barraza and Tony Milner**

16.     Plaintiffs Matthew Barraza and Tony Milner have been in a committed and loving relationship for nearly 11 years. (Barraza Decl.¶ 1, Feb. 1, 2014, attached as Ex. C; Milner Decl. ¶ 1, Feb. 1, 2014, attached as Ex. D.) Mr. Barraza is an attorney and Mr. Milner is the executive

director of a non-profit organization serving homeless families. (*Id.* ¶ 2.) Mr. Barraza and Mr. Milner are lifelong Utahans. Mr. Milner was born and raised in West Jordan.  (Milner Decl. ¶ 3.) Mr. Barazza, one of six siblings, was born in California but his family moved to Ogden when he was one year old. (Barraza Decl.¶ 3.) In 2007, Mr. Barraza and Mr. Milner held a religious commitment ceremony officiated by their pastor, Erin Gilmore of Holladay United Church of Christ, and have since referred to themselves as husbands and married. But this commitment was not recognized by the State of Utah. (Barraza Decl.¶ 4; Milner Decl. ¶ 4.)

17. Mr. Barraza and Mr. Milner had been contemplating starting a family when, in 2009, a struggling couple they knew who were expecting a baby approached them and asked if they would consider adopting the child. (*Id.* ¶ 5.) Mr. Barraza and Mr. Milner were overjoyed by the prospect of welcoming a child into their family. (*Id.*) They attended all of the birth mother's prenatal appointments with her and attended the birth, where Mr. Milner got to cut their son's umbilical cord. (*Id.*)

18. Their son, "J.," is now four years old. Although Mr. Barraza and Mr. Milner have raised J. from birth, only one of them was able to adopt J. and establish legal parentage under Utah law. (*Id.*¶ 6.) Mr. Barraza is the adoptive parent, which means that Mr. Milner is treated as a legal stranger to their son, and if something were to happen to Mr. Barraza, J. could potentially be placed in foster care.  (*Id.* ¶ 6.)

19. In 2010, Mr. Barraza and Mr. Milner traveled to Washington, D.C., to get married. (*Id.*¶ 7.) Although they were legally married, Amendment 3 prevented them from having their marriage recognized in Utah.  (Barraza Decl.¶ 7.) Even though that marriage was not recognized by the State, they chose to remain in Utah where they have tremendous family

and community support. (Barraza Decl. at ¶ 8; Milner Decl. at ¶ 8.) They want to continue to live, work and raise their son here. (*Id.*)

20. When they heard that Amendment 3 was ruled unconstitutional, Mr. Barraza and Mr. Milner were thrilled to finally have all of the legal protections that come with marriage. (*Id.*¶ 9.) Most importantly, their marriage would allow Mr. Milner to establish legal parentage with J. through a second-parent adoption. (*Id.*) They wanted to give J. the security of having two legal parents and wanted the peace of mind knowing that if something were to happen to Mr. Barraza, J. would have another legally recognized parent to care and provide for him. (*Id.*) On December 20, 2013, Mr. Barraza and Mr. Milner obtained a Utah marriage license and were married by Pastor Tom Nordberg of Holladay United Church of Christ that same day. (*Id.*¶ 10.)

21. Immediately after Christmas, on December 26, 2013, Mr. Barraza and Mr. Milner initiated court proceedings for Mr. Milner to adopt their son. (*Id.* ¶ 11.) They received a hearing date of January 10, 2014. (*Id.*) On January 9, 2014, however, the court contacted Mr. Barraza and Mr. Milner and informed them that because of the stay in *Kitchen*, and because of Governor Herbert's and Attorney General Reyes's announcements to State agencies to not recognize same-sex marriages, the court had decided to stay the adoption proceedings to consider the question of whether the Attorney General's office should be provided notice and the opportunity to intervene. (*Id.* ¶ 12.)

22. At a hearing on January 29, 2014, the judge ruled that notice be given to the Attorney General's office, allowing it the opportunity to intervene in the case to represent the State's position. (*Id.* ¶ 13.) After Mr. Barraza and Mr. Milner amend their petition explaining why the court should grant the second-parent adoption, the State will receive notice. The judge

indicated that he will rule after hearing from the State on whether it will intervene, rather than waiting for the outcome of either this suit or the *Kitchen* appeal to be decided.

23.     In the meantime, Mr. Barraza and Mr. Milner remain in a state of uncertainty over whether the court will recognize them as a married couple so that Mr. Milner can legally adopt J. and whether the Attorney General will interfere with the adoption process. The State's refusal to recognize their legal marriage has cast a cloud of uncertainty over the proceedings and destroyed the peace of mind they would have received by providing J. two legal parents. (Milner Decl. at ¶ 15.)

### Plaintiffs JoNell Evans and Stacia Ireland

24.     Plaintiffs JoNell Evans, 61 years old, and Stacia Ireland, 60 years old, have been in a committed relationship for 13 years. (Evans Decl. ¶¶ 1, 2, Feb. 1, 2014, attached as Ex. E; Ireland Decl.¶ 1, Feb. 1, 2014, attached as Ex. F.) Ms. Ireland taught math to junior high and high school students for 30 years and now works part-time at a community college helping students with disabilities. (Ireland Decl. ¶ 2.) Ms. Evans is an artist and a human resources director for a non-profit organization. (Evans Decl.¶ 3.) Ms. Evans and Ms. Ireland have lived in Utah their entire adult lives. (Ireland Decl.¶ 3; Evans Decl.¶ 4.) Their home is located on property in West Valley City that has been in Ms. Evans's family for generations. (*Id.*) Much of their family lives in the same neighborhood. (*Id.*)

25.     In 2007, Ms. Evans and Ms. Ireland affirmed their commitment with a religious marriage ceremony at the Unitarian Church in Salt Lake City. (Ireland Decl. ¶ 4; Evans Decl.¶ 5.) But their commitment was not recognized by the State of Utah. (*Id.*) In 2009, Ms. Evans and Ms. Ireland had wills and medical powers of attorney drawn up. (Ireland Decl. ¶ 5; Evans Decl.¶ 6.) They knew other same-sex couples who had been treated as legal strangers by hospitals, and

they wanted to ensure this would not happen to them should either of them be hospitalized. (*Id.*)

In 2010, Ms. Ireland suffered a heart attack. (Ireland Decl. ¶ 6; Evans Decl.¶ 7.) Before they left

for the hospital, Ms. Evans scrambled to locate a copy of Ms. Ireland's power of attorney.

(Ireland Decl.¶ 6; Evans Decl.¶ 7.) With documents in hand, the hospital staff tolerated Ms.

Evans's insistence that she stay by Ms. Ireland's side during her treatment, but did not treat Ms.

Evans like it would a spouse. (*Id.*) As Ms. Evans describes it, "It felt like I wasn't even in the

room." (Evans Decl. ¶ 7.)

26.     On December 20, 2013, Ms. Evans learned of the *Kitchen* decision. (*Id.* ¶ 8.) She

rushed to the Salt Lake County building and called Ms. Ireland to meet her there. (Ireland Decl. ¶

7; Evans Decl. ¶ 8.) After standing in line for a few hours, the couple received their marriage

license, and Salt Lake City Mayor Ralph Becker solemnized their marriage. (*Id.*) They were

surrounded by other couples and friends, all there to celebrate the right of same-sex couples to

finally marry.  (*Id.*) The only downside to the whirlwind wedding was that their families could

not make it there to witness their ceremony.  (*Id.*)

27.     On January 1, 2014, Ms. Evans again had to rush Ms. Ireland to the emergency

room because Ms. Ireland was experiencing severe chest pains. (Ireland Decl. ¶ 8; Evans Decl.¶

9.) Ms. Ireland informed the hospital that she had married Ms. Evans and during their stay in the

hospital, Ms. Evans was afforded all the courtesies and rights given to the married spouse of a

patient. (*Id.*) For example, the hospital allowed Ms. Evans to sign paperwork for Ms. Ireland and

consulted with her on all aspects of Ms. Ireland's treatment. (*Id.*)

28.     On the day after Governor Herbert directed State agencies to no longer recognize

the marriages of same-sex couples in Utah, Ms. Ireland had to return to the hospital for a follow-

up procedure. (Ireland Decl.¶ 9; Evans Decl.¶ 10.) Once again, they had to face uncertainty and

anxiety that the hospital would treat Ms. Evans like a non-entity instead of a spouse. (*Id.*) Ms. Evans and Ms. Ireland now worry that during any future emergency hospital visits, and even during routine care, they will no longer be afforded the same protections as other married couples. (Ireland Decl.¶ 10; Evans Decl.¶ 11.)

### Donald Johnson and Karl Fritz Schultz

29.     Plaintiffs Donald Johnson and Karl Fritz Schultz met in 1992, and have been "best friends and partners" for over 21 years. (Schultz Decl.¶ 1, Feb. 1, 2014, attached as Ex. G; Johnson Decl.¶ 1, Feb. 1, 2014, attached as Ex H.) Mr. Johnson was born and raised in Utah, attended the University of Utah, and has taught special education high school juniors and seniors in the same school district for 37 years. (Johnson Decl.¶ 2.) Mr. Schultz was raised in southern Idaho and attended Idaho State University. (Schultz Decl.¶ 2.) He came to Utah to begin his career in retail sales. (*Id.*) Mr. Johnson and Mr. Schultz started dating around Labor Day in 1992. (Schultz Decl.¶ 3; Johnson Decl.¶ 3.) After having to spend Thanksgiving apart that year, they both realized that they wanted to spend their lives together. (*Id.*) When Mr. Schultz returned from his family trip, Mr. Johnson proposed to him. (*Id.*) They have celebrated the Sunday after Thanksgiving as their anniversary ever since. (*Id.*)

30.     Mr. Johnson and Mr. Schultz have been a vital part of their close-knit neighborhood for many years. (*Id.* ¶ 4.) They describe themselves as the "neighbors who lend a hand" when it is needed. (Johnson Decl. ¶ 4.) They love taking care of their neighbors' dogs and keeping an eye on neighbors' houses when they go on vacation. (Schultz Decl. ¶ 4; Johnson Decl. ¶ 4.) Mr. Johnson and Mr. Schultz are always pitching in to shovel neighbors' walks and mow lawns. (*Id.*)

31.     On the Saturday morning after the *Kitchen* decision, Mr. Johnson and Mr. Schultz were sitting at breakfast when Mr. Schultz reached over the table, took Mr. Johnson's hand, and suggested they get married. (*Id.* ¶ 5.) Mr. Johnson and Mr. Schultz had been considering going to California to marry, but were elated to be able to marry in their home state. (*Id.* ¶ 6.) On December 22, 2013, Mr. Johnson got up at midnight, put on a suit, and went to stand in line at the Salt Lake County building at 2 a.m. Mr. Schultz joined him at 6 a.m. (*Id.* ¶ 7.) They got their marriage license at around 10 a.m. on December 23, 2013 and solemnized their marriage immediately. (*Id.*)

32.     For Mr. Johnson, being able to stand in front of his classroom and tell his students that he had married his partner of 21 years over the holidays and that "yes, indeed, [he] was a gay man" meant he no longer had to hide who he is and made him immensely proud and happy. (Johnson Decl. ¶ 8.) Mr. Johnson's students burst into applause after he told them. (*Id.*)

33.     Now that the State of Utah has refused to continue to recognize same-sex marriages, Mr. Johnson and Mr. Schultz feel that they have again been relegated to second-class citizenship in their own state. (Schultz Decl. ¶ 8; Johnson Decl. ¶ 9.) Mr. Johnson is 61 years old, and Mr. Schultz is 58 years old. (Schultz Decl. ¶ 9; Johnson Decl. ¶ 10.) Mr. Johnson researched insurance coverage for himself and Mr. Schultz and discovered that they could have access to savings of approximately $8,000 per year on health insurance that they will lose without State recognition of their marriage. (*Id.*)

## ARGUMENT

To secure a preliminary injunction, a movant "must establish the following elements: (1) a substantial likelihood of success on the merits; (2) irreparable injury will result if the injunction does not issue; (3) the threatened injury to the movant outweighs any damage the injunction may

cause the opposing party; and (4) issuance of the injunction would not be adverse to the public

interest." *N. Natural Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1266 (10th Cir. 2012)

(internal quotation marks and citation omitted). "Although generally, where the three latter harm

factors weigh in favor of the movant, the probability of success factor is relaxed, that is not the

case . . . where the requested injunction is one that alters the status quo." *Id.* (internal quotation

marks, brackets, and citations omitted). When an injunction alters the *status quo*, the Tenth

Circuit requires a "strong showing" of the substantial likelihood of success on the merits and the

weighing of harms factors. *Id.*

　　　Here, Plaintiffs do not seek to alter the *status quo*, but rather to have the Defendants

continue to recognize their marriages as Defendants had been doing prior to January 6, 2014.

Indeed, Defendants continue to recognize marriages of same-sex couples for certain purposes,

such as joint 2013 state tax filings and already-issued state documents with marriage-related

name changes. But to the extent the Court views the requested preliminary injunction as

changing the *status quo*, Plaintiffs meet the "strong showing" requirement on these two elements

as well**.**

## I.　　PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

　　　Governor Herbert and Attorney General Reyes have publically stated that once Utah's

same-sex marriage prohibitions went back into effect on January 6, 2014, those statutes

prohibit the State from recognizing the legal marriages of same-sex couples that had been

solemnized, like those of the Plaintiffs. The State's position is incorrect both as a matter of

statutory interpretation and as a matter of constitutional law.

　　　First and foremost, under Utah law, a marriage becomes valid on the date of

solemnization, and the benefits and rights that flow from those marriages become vested on

that date. Once rights vest, Utah law follows a strong presumption that they may not be impaired or taken away retroactively. *See Waddoups v. Noorda*, -- P.3d --, 2013 UT 64 (Nov. 1, 2013). Under this presumption, refusing to recognize the marriages of same-sex legally married in this state is impermissibly retroactive because it impairs vested rights that accrued at the time the marriages were solemnized. Moreover, even if the State's decision to place recognition of valid marriages "on hold" were not barred by the presumption against retroactivity, the State's refusal to recognize the Plaintiffs' marriage rights violates the due process protections of the Utah and United States constitutions. *See Miller v. USAA Cas. Ins. Co.*, 44 P.3d 663 (Utah 2002); *Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *Cook v. Cook*, 104 P.3d 857 (Ariz. Ct. App. 2005).

Although the facts of this case are somewhat unique, this Court is not writing on a blank slate. For over a century, courts have grappled with how to apply changes in state marriage laws in a wide range of contexts. These courts have consistently refused to apply new marriage restrictions in a manner that would retroactively strip recognition from marriages that have already taken place. *See Strauss*, 207 P.3d 48 (constitutional amendment declaring that only marriage between a man and a woman "is valid or recognized" cannot be applied retroactively to strip recognition from marriages of same-sex couples that had already taken place); *Cook*, 104 P.3d 857 (statute declaring that marriages between cousins from other jurisdictions are no longer recognized in Arizona could not be applied to marriages that were already recognized in Arizona before the statute was passed); *In re Ragan's Estate*, 62 N.W.2d 121 (Neb. 1954) (statute prohibiting common law marriages could not be applied retroactively to nullify existing marriages); *Cavanaugh v. Valentine*, 41 N.Y.S.2d 896 (N.Y. Sup. Ct. 1943) (same); *Atkinson v. Atkinson*, 203 N.Y.S. 49 (N.Y. App. Div. 1924) ("It cannot be held that the Legislature intended

that a marriage performed in accordance with the law existing at the time of performance can be declared void because of a subsequent change in the statute."); *Wells v. Allen*, 177 P. 180 (Cal. Ct. App. 1918) (giving legal effect to a common law marriage "which was a valid marriage in this state at the time these parties assumed that relation"); *Succession of Yoist*, 61 So. 384 (La. 1913) (anti-miscegenation statute declaring that "Marriages between white persons and persons of color are  . . . null and void" does not apply retroactively to interracial marriages already in existence); and *Callahan v. Callahan*, 15 S.E. 727 (S.C. 1892) ("If the act of 1865 should be given such retroactive effect in this case, it would result in nullifying the marriage of Green and Martha, which was a contract entered into by two persons having full power, as the law then stood, to make it a valid contract . . . . The relation of husband and wife, in law, subsisted between Green and Martha . . . vested rights spring therefrom, which could not be taken away by the subsequent legislation.").

Allowing Defendants to use Utah Code § 30-1-4.1 and Amendment 3 to put these marriages, valid and recognized at the time they were entered into, "on hold" would be an unprecedented step that no other court has taken. Utah does not have to license or recognize any new marriages now that the district court's decision has been stayed. But the stay does not authorize Utah to withdraw recognition from married couples, like Plaintiffs, whose rights have already vested.

### A.  When They Solemnized Their Marriages in Accordance With Utah Law, Plaintiffs and Other Married Same-Sex Couples Immediately Acquired Vested Rights in the Recognition of their Marriages.

It is an inevitability of civil litigation that sometimes parties cannot undo the effect of complying with a district court injunction even if that injunction is subsequently overturned or stayed pending appeal. For example, in *Morganroth &Morganroth v. DeLorean*, 213 F.3d 1301,

1310 (10th Cir. 2000), *overruled on other grounds by* TW Telecom Holdings Inc. v. Carolina Internet Ltd., 661 F.3d 495 (10th Cir. 2011), a court issued a preliminary injunction terminating the parties' interest in certain property and, before the injunction could be heard on appeal, the property was sold to a third party and could not be reclaimed. For this reason, courts routinely conclude that appeals from preliminary injunctions will be dismissed as moot if an injunction has been complied with and the actions taken in compliance cannot be undone. *See* Univ. of Tex. v. Camenisch, 451 U.S. 390, 398 (1981) ("[T]he question whether a preliminary injunction should have been issued here is moot, because the terms of the injunction ... have been fully and irrevocably carried out."); N. Natural Gas Co. v. Nash Oil & Gas, Inc., 374 Fed.Appx. 802, 805 (10th Cir. 2010) (unpublished) (appeal of preliminary injunction moot because "we cannot undo tests that have been completed.") In this case, the district court's Order enjoining Utah from enforcing its same-sex marriage bans has been "fully and irrevocably carried out" with respect to Plaintiffs and the other 1,000-plus same-sex couples who legally married. *Camenisch*, 451 U.S. at 398. Those couples acquired vested rights in their marriages that are protected by the Utah and United States constitutions.

Under Utah law, a marriage becomes valid on the date of solemnization.  *See* Walters v. Walters, 812 P.2d 64, 68 (Utah Ct. App. 1991), *see also* State v. Giles, 966 P.2d 872, 877 (Utah. Ct. App. 1998) (marriage valid from date of solemnization, even if officiant does not return certificate to county clerk). Once a couple is validly married, that couple immediately obtains all the protections and responsibilities of married couples under Utah law, such as the right to adopt a spouse's child, the right to add a spouse as a beneficiary to state-provided benefit programs, and the right to make medical decisions concerning a spouse. Indeed, in 2004, Utah's Lieutenant Governor and Utah's Office of Legislative Research and General Counsel (in conjunction with

the President of the Senate and Speaker of the House of the Utah Legislature) issued a Voter Information Pamphlet stating that, "when a man and a woman marry, they receive certain rights, benefits, and obligations provided in the law. A married man and woman receive those rights, benefits, and obligations automatically, by operation of law and solely by virtue of being married." (Utah Voter Information Pamphlet at p. 35, General Election Nov. 2, 2004, attached as Ex. I.)

Here, each of the Plaintiffs solemnized their marriages between December 20, 2013, and January 6, 2014, when same-sex marriages were legal in Utah. Accordingly, all of the Plaintiffs' marriages were valid as of the date of the solemnization. Indeed, the Attorney General himself recognized that same-sex marriages that were solemnized between December 20, 2013, and January 6, 2014 were "recognized at the time the ceremony was completed." (Compl. Ex. E (acknowledgment by Utah State Tax Commission that same-sex couples married as of December 31, 2013 are legally recognized as married couples for purposes of determining their tax-filing status in 2013).) As such, upon solemnization of their marriages, Plaintiffs immediately obtained all the protections and responsibilities of married couples under Utah law.

These benefits and rights that flow from Plaintiffs' marriages became vested immediately upon solemnization of their marriage. As early as 1892, the Utah Supreme Court examined whether marriage rights constituted "vested rights" under Utah law. Specifically, the Supreme Court looked at "rights . . . [that] grew out of a contract governing the marriage relation," and it determined as follows: "When a right has arisen upon a contract, or a transaction in the nature of a contract, authorized by statute, and has been so far perfected that nothing remains to be done by the party asserting it, . . . [i]t has then become a vested right." *Tufts v. Tufts*, 30 P. 309, 310 (Utah 1892) (quoting *Steamship Co. v. Joliffe*, 69 U.S. 450, 457-58 (1864)); *see also L.C.*

*Canyon Partners, L.L.C. v. Salt Lake County*, 2011 UT 63, ¶ 28, 266 P.3d 797 (defining a "vested interest" as "a completed, consummated right for present or future enjoyment"); *see also Cook,* 104 P.3d at 865 (holding under Arizona law: "Certainly, the status of being married is 'an immediate fixed right to present or future enjoyment.'") (citation omitted); *Strauss*, 207 P.3d at 122 (holding under California law:  "Here, same-sex couples who married after the decision in the Marriage Cases… was rendered, and before Proposition 8 was adopted, acquired vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances.").

When determining whether a right is "vested," Utah courts look at the law in effect at the time the right was bestowed upon the parties. *See In re Handley's Estate*, 49 P. 829, 831 (Utah 1897) (defining a "vested right" as "a right 'to do certain actions, or possess certain things,' which he has already begun to exercise, or to the exercise of which no obstacle exists *in the present laws of the land*") (quoting *Merill v. Sherburne*, 1 N.H. 199 (1818)(emphasis added); *Tufts*, 30 P. 309 (referring to rights that "grew out of a contract governing the marriage relation which existed *at the time*"). Here, Plaintiffs' marriages were authorized by law at the time they occurred. They were solemnized and perfected so that nothing remained to be done by the Plaintiffs asserting them. As such, Plaintiffs' marriage rights, along with the marriage rights of all the same-sex couples who solemnized their marriages between December 20, 2013, and January 6, 2014, are vested. Therefore, those rights cannot now be taken away regardless of the ultimate outcome in the *Kitchen* litigation.

**B.  Under Utah's Strong Presumption Against Retroactivity, The Recognition Bans May Not Be Applied Retroactively to Marriages of Same-Sex Couples That Were Valid and Recognized at the Time They Were Entered Into.**

1.  Utah's Strong Presumption Against Retroactivity

The longstanding rule of statutory construction in Utah is that "a party is entitled to have its rights determined on the basis of the law as it existed at the time of the occurrence, and a later statute or amendment should not be applied retroactively so as to deprive a party of its rights or impose greater liability upon it." *OSI Indust., Inc. v. Utah State Tax Comm'n, Auditing Div.*, 860 P.2d 381, 383 (Utah Ct. App. 1993); *accord State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829. Under this strong presumption against retroactivity, "[c]onstitutions, as well as statutes, should operate prospectively only unless the words employed show a clear intention that they should have a retrospective effect." *Shupe v. Wasatch Elec. Co.*, 546 P.2d 896, 898 (Utah 1976) (quoting *Mercur Gold Mining & Milling Co. v. Spry*, 52 P. 382, 384 (Utah 1898)); *accord* Utah Code Ann. § 68–3–3 ("A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive."). The presumption against retroactive application of changes in the law is deeply rooted in principles of elementary fairness and due process. Indeed, the U.S. Supreme Court has explained that "the presumption against retroactive legislation . . . embodies a legal doctrine centuries older than our Republic" and "[t]he principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994) (internal quotation marks omitted).

Utah's deeply-rooted presumption against retroactivity can be overcome only by "explicit statements that the statute should be applied retroactively or by clear and unavoidable implication that the statute operates on events already past." *Evans & Sutherland Computer Corp. v. Utah State Tax Comm'n*, 953 P.2d 435, 437 (Utah 1997) (citations omitted). Because retroactive applications are highly disfavored, "a court will and ought to struggle hard against a construction which will, by retrospective operation, affect the rights of parties." *Thomas v. Color*

*Country Mgmt.*, 84 P.3d 1201, 1210 (Durham, C.J., concurring) (quoting *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801)).[3]

When the legislature intends for a law to apply retroactively, it knows how to say so explicitly. *See*, *e.g.*, Utah Code § 19–6–302.5(3)(a) ("this act applies retroactively"); *id.* § 48–3a–206 ("is effective retroactively"); *id.* § 77–40–113 ("provisions of this chapter apply retroactively"); *id.* § 75–7–1103(1) ("[T]his chapter applies to: all trusts created before, on, or after July 1, 2004 ... [and] judicial proceedings concerning trusts commenced before July 1, 2004."). Here, the legislature made no such explicit statements that the law should be applied retroactively. To the contrary, Utah Code § 30-1-4.1 states: "It *is* the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter" and "this state *will* not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married." Amendment 3 states that "Marriage *consists* only of the legal union between a man and a woman" and "[n]o other domestic union, however denominated, *may be* recognized as a marriage or given the same or substantially equivalent legal effect."

The use of the present tense in Utah Code § 30-1-4.1 and Amendment 3 sounds the death knell for Defendants' attempt to retroactively use those provisions to withhold recognition of Plaintiffs' marriages, especially in light of the Utah Supreme Court's recent ruling, *Waddoups v. Noorda*, 2013 UT 64. In that case, a plaintiff suffered injury and had an accrued cause of action

---

[3] Although dicta in earlier cases referred to an exception from the retroactivity ban for "clarifying amendments" to statutes, the Utah Supreme Court recently disapproved of this dicta and clarified that Utah's presumption against retroactivity does not include "an exception for clarifying amendments per se. The sole exception spelled out explicitly by statute requires an express provision for retroactivity." *Gressman v. State*, 2013 UT 63, ¶ 16; *accord Waddoups*, 2013 UT 64, ¶ 9.

for "negligent credentialing" on May 24, 2010. *Waddoups*, 2013 UT 64, ¶ 2. The Legislature

passed a new statute that became effective on May 10, 2011, which read as follows: "It is the

policy of this state that the question of negligent credentialing, as applied to health care providers

in malpractice suits, is not recognized as a cause of action." *Id.* at ¶ 4.The plaintiffs then filed suit

thereafter. Noting that "[l]aws that "eliminate or destroy vested or contractual rights . . . are

barred from retroactive application absent express legislative intent," *id.* at ¶ 8, the Supreme

Court examined the language of the statute and determined that it was not retroactive:

> It simply cannot be said that the use of the present tense communicates a
> clear and unavoidable implication that the statute operates on events
> already past. If anything, use of the present tense implies an intent that the
> statute apply to the present, as of its effective date, and continuing
> forward.

*Id.* at ¶ 7. The Supreme Court's analysis in *Waddoups* is directly applicable to this case. Because

Utah Code § 30-1-4.1 and Amendment 3 are all phrased in the present and future tenses, they do

not contain the "clear and unavoidable" implication that they "operate on events already past."

*Waddoups*, 2013 UT 64, ¶ 7.

The Supreme Court's analysis in *Waddoups* is consistent with the analysis of the

California Supreme Court in *Strauss*. Like Utah Code § 30-1-4.1 and Amendment 3, California's

Proposition 8 was phrased in the present tense: "Only marriage between a man and a woman is

valid or recognized in California." The California Supreme Court concluded that Proposition 8's

use of the present tense meant that it could not be applied to marriages entered into before its

effective date because "a measure is written in the present tense ('is valid or recognized') does

not clearly demonstrate that the measure is intended to apply retroactively." *Strauss*, 207 P.3d at

120; *see also Cook*, 104 P.3d at 865 n.2 (statute declaring that "[m]arriage    . . . between first

cousins, *is* prohibited and void" does not apply retroactively (emphasis added)); *Succession of*

*Yoist*, 61 So. at 384 (statute declaring that "Marriages between white persons and persons of color are prohibited, and the celebration of such marriages *is* forbidden, and such celebration carries with it no effect, and *is* null and void" does not apply retroactively (emphases added)).

In sum, the Legislature declined to include an explicit statement in Utah Code § 30-1-4.1 and Amendment 3 regarding retroactivity. To the contrary, the Legislature chose to use the present tense, which implies an intent that the statute and constitutional amendment should only apply prospectively. As such, the State cannot overcome the presumption against retroactivity. *Cf. Cook*, 104 P.3d at 867 ("Had the legislature chosen to nullify existing marriages (thus having the retroactive effect described) it could have expressly stated so.  It did not.")

2.    The State's Misapplication of Retroactivity Principles

Defendants' public position reflects a misunderstanding of what it means to "retroactively" apply amendments and statutes under Utah law. In explaining their reasoning for placing the marriages of Plaintiffs and other same-sex couples "on hold," Defendants imply that their actions are prospective because they are not unwinding marriages completed before January 6, 2014, but are simply refusing to "recognize" those marriages in the future. For example, in his January 8, 2014 Directive, Governor Herbert stated:

> For example, if a same-sex married couple previously changed their names on new drivers licenses, those licenses should not be revoked. If a same-sex couple seeks to change their names on drivers licenses now, the law does not allow the state agency to recognize the marriage therefore the new drivers licenses cannot be issued.

(Compl. Ex. D.)

Defendants' logic in these statements contradicts what it means to have a "vested" right and to apply a statute retroactively. As noted above, a "vested interest" is "a completed, consummated right for *present or future* enjoyment." *L.C. Canyon Partners, L.L.C. v. Salt Lake*

26

*County*, 2011 UT 63, ¶ 28, 266 P.3d 797. Furthermore, retroactive laws constitute any statute

"which, though operating only from their passage, affect[s] vested rights and past transactions.'"

*Landgraf*, 511 U.S. at 267-68. Accordingly, in Utah, as in other jurisdictions, a retroactive

application of a law is defined as an application that "'takes away or impairs vested rights

acquired under existing laws . . . in respect to transactions or considerations already past.'"

*Payne By and Through Payne v. Myers*, 743 P.2d 186, 190 (Utah 1987); *see also Landgraf*, 511

U.S. at 269.

Under this definition, Defendants' placing recognition of Plaintiffs' marriages on hold is

a retroactive application of the amendment and statute because the hold "takes away or impairs

vested rights acquired under existing laws" at the time the marriages were entered into. *Payne By*

*and Through Payne*, 743 P.2d at 190. The California Supreme Court in *Strauss* directly

addressed this point. The *Strauss* case dealt with the validity of the marriages of same-sex

couples married after the decision in the *In re Marriage Cases*,[4] and before Proposition 8 was

adopted on November 4, 2008. Proposition 8 stated: "Only marriage between a man and a

woman is valid or recognized in California." As such, the proponents of Proposition 8 in *Strauss*

argued that applying Proposition 8 to deny recognition to preexisting marriages was not

retroactive, "even if the marriages that are now (or in the future would be) denied recognition

were performed prior to the adoption of Proposition 8," because the Proposition 8 would be

applied "only to acts that occur after Proposition 8 became effective." *Strauss*, 207 P.3d at 120.

The California Supreme Court rejected that argument and explained that "[w]ere Proposition 8 to

be applied to invalidate or to deny recognition to marriages performed prior to November 5,

2008, rendering such marriages ineffective in the future, such action would take away or impair

---

[4]In re *Marriage Cases*, 43 Cal. 4th 757 (2008), was a California Supreme Court case holding that an
existing statute and initiative measure limiting marriage to opposite-sex couples was unconstitutional
under the California Constitution.

vested rights acquired under the prior state of the law and would constitute a retroactive application of the measure." *Id.*; *see also Cook*, 104 P.3d at 865 ("Certainly, the status of being married is 'an immediate fixed right to present or future enjoyment.'").

Defendants may also argue that Utah's normal presumption against interpreting statutes and constitutional amendments in a manner that impairs vested rights should not apply when the law changes as a result of an injunction that is stayed pending appeal.  To be sure, in this case, Utah Code § 30-1-4.1 and Amendment 3 are not new statutes, but rather statutes that were rendered inoperable by the federal district court's injunction and then put back into effect after the Supreme Court's stay. This unusual posture, however, does not change the principles at stake or the background presumption that the Legislature does not intend for its statutes to be used to impair vested rights.[5] It makes no difference whether the law changes as a result of a new statute or a stay of a federal court injunction.

### C.  Refusing to Recognize These Valid Marriages Impermissibly Violates the Due Process Clauses of the Utah and United States Constitutions.

Even if Utah's presumption against retroactivity did not prohibit Defendants' refusal to recognize Plaintiffs' pre-existing marriages, doing so violates the due process guarantees of the Utah and United States constitutions. The courts are obligated to interpret statutes in a manner that avoids constitutional concerns, *see State v. Mooney*, 98 P.3d 420, 425 (Utah 2004), and must

---

[5] Indeed, the legislative history makes it clear that the legislators *knew* that this statute could easily lead to litigation. During legislative debates, Senator Patrice Arent asked why the State of Utah was "buying [itself] another lawsuit." She specifically noted that the very drafters of the bill acknowledged that "critics of this legislation . . . can assert with great force that any attempt in Utah to confine the meaning of marriage or limit the intimates to marriage to the historical relationship of a man and a woman is unconstitutional. I simply cannot assure you with any degree of certainty that these claims will not prevail." Senator Arent stated that she felt like the Legislature "should take the bill and just staple a check to the ACLU on it." *Marriage Recognition Policy*: Senate Floor Debate on SB 24s1, 3rd reading, final passage, Senate day 12 at 29:40 – 30:40 (Statement of Sen. Patrice Arent) (http://le.utah.gov/jsp/jdisplay/billaudio. jsp?sess=2004GS&bill=sb0024s01&Headers=true). The Legislature knew that the statute at issue was subject to litigation, yet opted not to include the explicit language that would be necessary to overcome the presumption against retroactivity.

interpret state constitutional amendments in a manner that harmonizes them with other

constitutional provisions, *see Univ. of Utah v. Shurtleff*, 144 P.3d 1109, 1114 (Utah 2006).

The Fourteenth Amendment provides that no "State [shall] deprive any person of life,

liberty, or property, without due process of law." U.S. Const. Amend XIV, § 1.  Article I, Section

7 of the Utah Constitution similarly provides that guarantees that "[n]o person shall be

deprived of life, liberty or property, without due process of law."  The Utah Supreme Court has

explained that these protections are broad and expansive:

> The words "life," "liberty," and "property" are constitutional terms, and are to be
> taken in their broadest sense. They indicate the three great subdivisions of all civil
> right. The term 'property,' in this clause, embraces all valuable interests which a
> man may possess outside of himself; that is to say, outside of his life and liberty.
> It is not confined to mere tangible property but extends to every species of vested
> right.

*Miller*, 44 P.3d at 674 (citations and emphasis omitted). The Utah Supreme Court has repeatedly

held that the constitutional guarantees of due process include the vested right to file or continue

pursuing legal claims that fully accrued under then-existing law. *See id.* ("Causes of action or

claims that have accrued under existing law are vested property rights just as tangible things are

property.");  *see also Payne by and through Payne*, 743 P.2d at 190 ("This [c]ourt has held that a

vested right of action is a property right protected by the due process clause."); *Spanish Fork W.*

*Field Irrigation Co. v. Dist. Court*, 104 P.2d 353, 360 (1940) (stating that a "'vested right of

action is property in the same sense [that] tangible things are property'" (citation omitted));

*Buttrey v. Guaranteed Sec. Co.*, 300 P. 1040, 1045 (1931) (holding that cause of action under

blue sky law was "in the nature of a property right"); *Halling v. Indus. Comm'n*, 263 P. 78, 81

(1927) (indicating that denial of vested right of action would violate due process clause).

Plaintiffs' vested rights in their marriages constitute a far more significant property

interest than the right to pursue an individual legal claim. As discussed above, marriage carries

with it a wide range of protections and responsibilities that flow automatically by operation of law. Refusing to recognize these valid marriages also infringes upon a host of other liberty interests protected by the Fourteenth Amendment.

Whether or not the U.S. District Court in *Kitchen* was correct in holding that the Fourteenth Amendment requires Utah to allow same-sex couples to marry, once a legal marriage occurs, the Constitution prohibits Defendants from taking away the vested rights connected to that relationship. *See Zablocki v. Redhail*, 434 U.S. 374, 383-84 (1978) (discussing fundamental right of marriage); *see also United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) (divesting "married same-sex couples of the duties and responsibilities that are an essential part of married life" violates due process). These interests have been described by the U.S. Supreme Court, in discussing the liberty interest protected by the U.S. Constitution as part of the fundamental right to marry, as the right to establish a home, raise children, and enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free persons. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Defendants' decision to place Plaintiffs' marriages "on hold" infringes upon fundamental constitutional protections in family integrity. "[T]he relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." *Lehr v. Robertson*, 463 U.S. 248, 258 (1983); *accord In re J.P.* 648 P.2d 1364, 1373 (Utah 1982) (explaining that "[t]he rights inherent in family relationships-husband-wife, parent-child, and sibling-are the most obvious examples of rights" protected by the constitution). In the case of married same-sex couples whose second-parent adoption proceedings have been thrown into question, Utah's directive also burdens their fundamental right in "the custody, care and nurture" of their children. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *accord In re J.P.*, 648 P.2d at 1372.

Because retroactively stripping marriages of these vested rights violates due process rights, the court should follow the example of the California Supreme Court in *Strauss* and the Arizona Court of Appeals in *Cook* and construe Utah Code § 30-1-4.1 and Amendment 3 to avoid these constitutional difficulties.  As the California Supreme Court explained in *Strauss*:

> Here, same-sex couples who married after the decision in the *Marriage Cases*, was rendered, and before Proposition 8 was adopted, acquired vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances. These couples' reliance upon this court's final decision in the Marriage Cases was entirely legitimate. A retroactive application of the initiative would disrupt thousands of actions taken in reliance on the *Marriage Cases* by these same-sex couples, their employers, their creditors, and many others, throwing property rights into disarray, destroying the legal interests and expectations of thousands of couples and their families, and potentially undermining the ability of citizens to plan their lives according to the law as it has been determined by this state's highest court. By contrast, a retroactive application of Proposition 8 is not essential to serve the state's current interest (as reflected in the adoption of Proposition 8) in preserving the traditional definition of marriage by restricting marriage to opposite-sex couples; that interest is honored by applying the measure prospectively and by having the traditional definition of marriage enshrined in the state Constitution where it can be altered only by a majority of California voters.
>
> Under these circumstances, we conclude that interpreting Proposition 8 to apply retroactively would create a serious conflict between the new constitutional provision and the protections afforded by the state due process clause. In the absence of a clear and unambiguous statement that the new provision is to have such an effect, the general legal guideline that requires courts to interpret potentially conflicting constitutional provisions in a manner that harmonizes the provisions, to the extent possible, further supports the conclusion that Proposition 8 properly must be interpreted to apply only prospectively.

*Strauss*, 207 P.3d at 122 (citations omitted).

The Arizona Court of Appeals in *Cook* similarly concluded that refusing to recognize an out of state marriage that had previously been recognized would violate constitutional guarantees of due process.

> By construing the statute to apply prospectively only, we harmonize the 1996 amendments with Arizona's constitutional prohibitions against retroactive

legislation. We do not impair the legislature's expressly recognized ability to declare as "void" marriages recognized as valid in other jurisdictions, so long as the party asserting the right to the valid out-of-state marriage did not have a vested right as defined herein. Appellant asserts that we should construe the term "void" to apply to all marriages existing in the state of Arizona at the time of the 1996 amendments. We agree this is a plausible construction, as a "void" marriage has been construed to mean that the marriage "shall have no force and effect for any purpose within the State of Arizona." However, as we have discussed above, giving such a reading creates a significant constitutional concern.

*Cook*, 104 P.3d at 866 (citations omitted).

For all the reasons herein, Plaintiffs have shown a substantial likelihood that they will prevail on the merits.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION DOES NOT ISSUE.

Because Defendants' decision to strip recognition of Plaintiffs' marriages violates the Utah and Untied States constitutions, Plaintiffs are experiencing irreparable harm as a matter of law.  As explained in *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012):

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Furthermore, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotations omitted).

Here, Defendants are violating Plaintiffs' state and federal constitutional rights by currently refusing to recognize their marriages, which were valid and recognized at the time they were entered into.  Under Tenth Circuit precedent, these circumstances alone meet the irreparable harm standard.

By refusing to recognize their marriages, the State of Utah's actions also imposed immediate harm on married same-sex couples and their families by creating second-class

marriages that do not enjoy the rights and privileges of different-sex marriages. Like the law struck down in *United States v. Windsor*, Utah's decision to place same-sex couples' marriages "on hold" "deprive[s] some couples married under the laws of their State, but not other couples, of both rights and responsibilities." 133 S.Ct. at 2694. Governor Herbert's Directive to withdraw recognition of Plaintiffs' marriages "undermines both the public and private significance of state-sanctioned same-sex marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of . . . recognition. This places same-sex couples in an unstable position of being in a secondtier marriage. . . .And it humiliates [the] children now being raised by same-sex couples." *Id.*

Further, Defendants already conceded that Plaintiffs and other married same-sex couples are suffering irreparable harm in their "Application to Stay Judgment Pending Appeal" with the U.S. Supreme Courtin the *Kitchen* litigation. In that stay application, Governor Herbert and Attorney General Reyes told the Supreme Court:

> The State's responsibility for the welfare of all its citizens makes it relevant, as well, that Respondents and any other same-sex couples who choose to marry during the period before the Tenth Circuit and this Court resolve this dispute on the merits will likely be irreparably harmed without a stay. They and their children will likely suffer dignitary and financial losses from the invalidation of their marriages if appellate review affirms the validity of Utah's marriage laws. The State thus seeks a stay, in part, to avoid needless injuries to same-sex couples and their families that would follow if the marriage licenses that they obtain as a result of the district court's injunction are ultimately found invalid-simply because the district court refused (as did the Tenth Circuit) to stay that injunction pending appellate resolution of the central legal issue in this case.

(Application to Stay at p. 21, relevant portion attached hereto as Ex. J.) This Court has discretion to treat these statementsas a judicial admission.  *See Guidry v. Sheet Metal Workers Intern. Ass'n, Local No. 9*, 10 F.3d 700, 715 (10th Cir 1993). Defendants have thus already

conceded that retroactively withdrawing recognition of Plaintiffs' marriages imposes irreparable financial and dignitary harms on married same-sex couples and their families.

In addition to these harms, the state of legal limbo created by Defendants has imposed its own set of irreparable harms as well. If, as many expect, the *Kitchen* case is ultimately heard by the Supreme Court, that litigation would not be resolved until sometime in 2015 or 2016 at the earliest. Plaintiffs and other married same-sex couples have vested rights in the continued recognition of their marriages and an urgent need for those marriages to be recognized *now* as they face the same life events and financial decisions in 2014 and 2015 that any other family encounters over the course of two years. *Cf. Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 484 (C.D.Cal.2012) (finding that when plaintiffs' insurance policies had been placed in "legal limbo . . .[t]he resulting uncertainty, stress, and inability to plan are sufficient to constitute irreparable harm").

Plaintiffs and their families need to complete second-parent adoption proceedings, buy health insurance coverage, plan for hospital visits, and organize the basic affairs of their lives. For example, Mr. Milner and Mr. Barazza face unnecessary doubt about whether Mr. Milner will be able to adopt J. to provide him with the stability of a family with two legally recognized parents. Meanwhile, Ms. Evans and Ms. Ireland face needless uncertainty about whether Ms. Evans will be able to participate in medical decisions affecting Ms. Ireland. Finally, all of the Plaintiffs face the indignity of Defendants treating their marriages as under an indefinite cloud. The indignity and uncertainty caused by Defendants' actions are impossible to quantify in a dollar amount, and damages would be inadequate to remedy them.

III.       **THE BALANCE OF HARMS STRONGLY FAVORS PLAINTIFFS.**

"[I]f the moving party establishes a likelihood of success on the merits, the balance of

harms normally favors granting preliminary injunctive relief because the public interest is not

harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."

*ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *see also Hobby Lobby Stores, Inc.*

*v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (plurality) ("When [a] law ... is

likely unconstitutional, the[ ] interests [of those the government represents, such as voters] do not

outweigh [a plaintiff's interest] in having [its] constitutional rights protected." (quoting *Awad*,

670 F.3d at 1131–32 (alterations in *Hobby Lobby*)). Here, since a retroactive application of Utah

laws banning marriage by Plaintiffs would violate the Utah and United States Constitution, the

State does not have a legitimate interest in depriving Plaintiffs of their constitutional rights.

Indeed, the balance of harms in this case decisively tips in favor of Plaintiffs. As

discussed above in connection with Plaintiffs' irreparable harm, Plaintiffs and their families face

serious hardships from the Defendants' refusal to recognize their marriages. In addition to the

non-monetary harms described above, Plaintiffs are also suffering monetary damages. For

example, Mr. Johnson and Mr. Schultz could be saving thousands of dollars in insurance

premiums if their marriage was recognized by the State. All of these harms are real, immediate,

and significant.

On the other side of the scale, Defendants will not suffer any harm – much less

irreparable harm – from continuing to recognize Plaintiffs' marriages as they did from December

20, 2013 to January 6, 2014. The Governor's December 24, 2013 e-mail to his cabinet indicated

that "many agencies will experience minimal or no impact" from such recognition.  (Compl. Ex.

B.) Further, continuing to recognize Plaintiffs' marriages will not significantly detract from the

State's interest in enforcing Utah's marriage bans pending the appeal in *Kitchen* because Defendants can enforce those marriage bans with respect to new marriages. As the California Supreme Court explained in *Strauss* with respect to California's Proposition 8: "[A] retroactive application of Proposition 8 is not essential to serve the state's current interest (as reflected in the adoption of Proposition 8) in preserving the traditional definition of marriage by restricting marriage to opposite-sex couples; that interest is honored by applying the measure prospectively . . . ." *Strauss*, 207 P.3d at 122.

      Accordingly, the balance of harms favors Plaintiffs.

## IV.      AN INJUNCTION IS IN THE PUBLIC INTEREST

      "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (internal quotation marks and citations omitted.)  Here, since Defendants' actions violate Plaintiffs' rights, an injunction would be in the public's interest.

      Moreover, from a practical perspective, the public is well served by having certainty about the status of Plaintiffs' marriages. From state agencies trying to determine benefit applications to private insurers  and employers deciding who is a spouse, an injunction will provide clarity for the parties and guidance for third parties. Indeed, even Governor Herbert acknowledges that the legal status of Plaintiffs and other married same-sex couples "is for the courts to decide." (Compl. Ex. B.) With over 1,000 married same-sex couples facing uncertainty over their legal status, it is in the public interest for the courts to provide clarity now instead of allowing a state of legal limbo to persist through what could easily be the next two years.

## CONCLUSION

For all these reasons, Plaintiffs move the court to issue an injunction against Defendants as follows:

Defendants must immediately recognize the marriages by same-sex couples entered into pursuant to Utah marriage licenses issued between December 20, 2013, and January 6, 2014, including Plaintiffs' marriages, as valid marriages and must afford all such couples, including Plaintiffs, and their families with all of the protections and responsibilities given to all married couples under Utah law.

DATED this 4th day of February, 2014.

STRINDBERG & SCHOLNICK, LLC

/s/ Lauren I. Scholnick
Erik Strindberg
Lauren I. Scholnick
Kathryn Harstad
Rachel E. Otto

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading was served upon the following via the CM/ECF

electronic delivery system.

JONI J. JONES
KYLE K. KAISER
Office of the Utah Attorney General
160 East 300 South
Salt Lake City, UT 84114
jonijones@utah.gov
kkaiser@utah.gov

                              /s/ Rachel Otto

**LIST OF EXHIBITS**

A.      Declaration of Marina Gomberg
B.      Declaration of Elenor Heyborne
C.      Declaration of Matthew Barraza
D.      Declaration of Tony Milner
E.      Declaration of JoNell Evans
F.      Declaration of Stacia Ireland
G.      Declaration of Karl Fritz Schultz
H.      Declaration of Donald Johnson
I.      Utah Voter Information Packet concerning Amendment 3
J.      Application to Stay filed by State of Utah with the U.S. Supreme Court, relevant portion