# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **JONELL EVANS, STACIA IRELAND, MARINA GOMBERG, ELENOR HEYBORNE, MATTHEW BARRAZA, TONY MILNER, DONALD JOHNSON, and KARL FRITZ SHULTZ,** | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | **Case No. 2:14CV55DAK** |
| vs. | **Judge Dale A. Kimball** |
| **STATE OF UTAH, GOVERNOR GARY HERBERT, ATTORNEY GENERAL SEAN REYES,** | |
| Defendants. | |

This matter is before the court on Plaintiffs JoNell Evans, Stacia Ireland, Marina Gomberg, Elenor Heyborne, Matthew Barraza, Tony Milner, Donald Johnson, and Karl Fritz Shultz's Motion for Preliminary Injunction, Plaintiffs' Motion to Certify Questions of Utah State Law to the Utah Supreme Court, and Defendants State of Utah, Governor Gary Herbert, and Attorney General Sean Reyes' (collectively, "the State") Motion to Certify Questions of Utah State Law to the Utah Supreme Court. The court held a hearing on Plaintiffs' Motions on March 12, 2014.[1] At the hearing, Plaintiffs were represented by Erik Strindberg, Joshua A. Block, and John Mejia, and the State was represented by Joni J. Jones, Kyle J. Kaiser, and Parker Douglas.

---

[1] The State's Motion to Certify Questions of Utah State Law was not filed until after the hearing was held. The motion is fully briefed, and the court concludes that a separate hearing on the motion is unnecessary.

After carefully considering the parties' arguments, as well as the law and facts relevant to the motions, the court enters the following Memorandum Decision and Order.

## FACTUAL BACKGROUND

The present lawsuit is brought by four same-sex couples who were married in Utah between December 20, 2013, and January 6, 2014. Plaintiffs allege deprivations of their property and liberty interests under Utah and federal law resulting from the State of Utah's failure to recognize their marriages.

### A. *Kitchen v. Herbert* Case

On December 20, 2013, United States District Judge Robert J. Shelby issued a ruling in *Kitchen v. Herbert*, 2:13cv217RJS, 2013 WL 6834634 (D. Utah Dec. 23, 2013), enjoining the State of Utah from enforcing its statutory and constitutional bans on same-sex marriages (collectively, "marriage bans").[2] The State did not request a stay of the ruling in the event that it lost, and the court's decision did not *sua sponte* stay the ruling pending appeal. After learning of the adverse ruling, the State then requested a stay from the district court, which Judge Shelby denied on December 23, 2013. The Tenth Circuit denied the State's subsequent request for a

---

[2] In 1977, the Utah Legislature amended Utah Code Section 30-1-2 to state "[t]he following marriages are prohibited and declared void": [marriages] "between persons of the same sex." Utah Code Ann. § 30-1-2(5). In 2004, the Utah Legislature added Utah Code Section 30-1-4.1, which provides: "It is the policy of this state to recognize as marriage only the legal union of a man and a woman;" and "this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties [to same-sex couples] that are substantially equivalent to those provided under Utah law to a man and a woman because they are married." *Id.* § 30-1-4.1(1)(a), (b). In the November 2004 general election, Utah voters passed Amendment 3, which added Article I, Section 29 to the Utah Constitution, effective January 1, 2005, which provides: "(1) Marriage consists of only the legal union between a man and a woman. (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect."

stay on December 24, 2013.  The State moved for a stay with the United States Supreme Court

on December 31, 2013, and the Supreme Court granted a stay on January 6, 2014 ("Stay Order").

**B.  State's Response to *Kitchen* Decision**

After the *Kitchen* decision was issued on December 20, 2013, some county clerks began

issuing marriage licenses to same-sex couples that same day.  On December 24, 2013, Governor

Herbert's office sent an email to his cabinet, stating: "Where no conflicting laws exist you should

conduct business in compliance with the federal judge's ruling until such time that the current

district court decision is addressed by the 10th Circuit Court."  Also on that day, a spokesperson

for the Utah Attorney General's Office publicly stated that county clerks who did not issue

licenses could be held in contempt of court.

Between December 20, 2013 and January 6, 2014, the State of Utah issued marriage

licenses to over 1,300 same-sex couples.  While it is not known how many of those couples

granted licenses solemnized their marriages before January 6, 2014, news reports put the number

at over 1,000.

The United States Supreme Court's January 6, 2014 Stay Order did not address the legal

status of the marriages entered into by same-sex couples in Utah between December 20, 2013,

and January 6, 2014, as a result of the *Kitchen* decision.  The Supreme Court's Stay Order stated:

> The application for stay presented to Justice Sotomayor and by her
> referred to the Court is granted.  The permanent injunction issued
> by the United States District Court for the District of Utah, case no.
> 2:13-cv-217, on December 20, 2013, is stayed pending final
> disposition of the appeal by the United States Court of Appeals for
> the Tenth Circuit.

Also on January 6, 2014, after the Supreme Court's Stay Order, Utah Attorney General

Sean Reyes issued the following statement: "Utah's Office of Attorney General is carefully

evaluating the legal status of the marriages that were performed since the District Court's decision and will not rush to a decision that impacts Utah citizens so personally."

Two days later, Governor Herbert's chief of staff sent an email to the Governor's cabinet informing them of the Supreme Court's stay and stating that "[b]ased on counsel from the Attorney General's Office regarding the Supreme Court decision, state recognition of same-sex marital status is ON HOLD until further notice." The email stated that the cabinet members should "understand this position is not intended to comment on the legal status of those same-sex marriages – that is for the courts to decide. The intent of this communication is to direct state agency compliance with current laws that prohibit the state from recognizing same-sex marriages." Furthermore, the email instructed that "[w]herever individuals are in the process of availing themselves of state services related to same-sex martial status, that process is on hold and will stay exactly in that position until a final court decision is issued."

The next day, Attorney General Reyes issued a letter to county attorneys and county clerks to provide "legal clarification about whether or not to mail or otherwise provide marriage certificates to persons of the same sex whose marriage ceremonies took place between December 20, 2013, and January 6, 2014, prior to the issuance of the stay by the U.S. Supreme Court." Attorney General Reyes continued that "although the State of Utah cannot currently legally recognize marriages other than those between a man and a woman, marriages between persons of the same sex were recognized in the State of Utah between the dates of December 20, 2013 until the stay on January 6, 2014. Based on our analysis of Utah law, the marriages were recognized at the time the ceremony was completed." He explained that "the act of completing and providing a marriage certificate for all couples whose marriage was performed prior to the morning of January 6, 2014, is administrative and consistent with Utah law" and "would allow, for instance,

same-sex couples who solemnized their marriage prior to the stay to have proper documentation in states that recognize same-sex marriage."

Furthermore, Attorney General Reyes stated that the State of Utah would not challenge the validity of those marriages for the purposes of recognition by the federal government or other states. But, "the validity of the marriages in question must ultimately be decided by the legal appeals process presently working its way through the courts."

On January 15, 2014, the Utah State Tax Commission issued a notice stating that same-sex couples "may file a joint return if they [were] married as of the close of the tax year" for 2013 because "[a]s of December 31, 2013, the Supreme Court had not yet issued its stay of the District Court's injunction." The notice further stated: "This notice is limited to the 2013 tax year. Filing information for future years will be provided as court rulings and other information become available."

## C. Plaintiffs' Responses to *Kitchen* Decision

Plaintiffs Marina Gomberg and Elenor Heyborne obtained their marriage license and solemnized their marriage on December 20, 2013. They had been in a relationship for nine years and had previously performed a commitment ceremony in May 2009, even though the State of Utah did not recognize the union. They have been contemplating having a baby but are worried about protecting their family because the State of Utah will only allow one of them to be a legal parent to any children that they raise together. Gomberg and Heyborne do not want to move to another state to have their marriage recognized.

Plaintiffs Matthew Barraza and Tony Milner also obtained their marriage license and solemnized their marriage on December 20, 2013. They had been in a committed relationship for nearly 11 years. In 2010, Barraza and Milner traveled to Washington, D.C., and got married.

However, Utah law prevented any recognition of their marriage in Utah. In 2009, Barraza adopted a son, J., who is now four years old. Under Utah law, Milner was not allowed to be an adoptive parent to J. even though he and Barraza are jointly rasing J.

On December 26, 2013, Barraza and Milner initiated court proceedings for Milner to adopt their son. The court scheduled a hearing date for January 10, 2014. On January 9, 2014, the court informed them that the court had decided to stay the adoption proceedings to consider whether the Utah Attorney General's Office should be notified of the proceedings and allowed to intervene. The court held a hearing on January 29, 2014, and ruled that the Attorney General's Office should be given notice. The Attorney General's Office declined to intervene but filed a brief stating that the court should stay the proceedings until the Tenth Circuit decided the appeal in *Kitchen.* On March 26, 2014, the state court judge, the Honorable Andrew H. Stone, rejected the Attorney General's arguments and ordered that Milner should be allowed to adopt J.

On April 1, 2014, Milner and Barraza's attorney went to the Utah Department of Health, Office of Vital Records, to obtain a new birth certificate for J. based on Judge Stone's Decree of Adoption. Although he presented a court-certified decree of adoption and report of adoption, which are the only records needed under Utah law and regulation to create a new birth certificate based on adoption, the registrar refused to issue a new birth certificate. The registrar asked for a copy of Barraza and Milner's marriage certificate, even though a marriage certificate is not usually required, and contacted the Utah Attorney General's Office. Two attorneys from the Utah Attorney General's Office instructed the registrar not to issue the amended birth certificate for J.

On April 7, 2014, the Utah Department of Health served Milner and Barraza with a Petition for Emergency Extraordinary Relief, which it had filed in the Utah Supreme Court. In

that Petition, the Department of Health requests a court order relieving it from recognizing Judge Stone's decree of adoption because it recognizes Milner and Barraza's same-sex marriage. On May 7, 2014, Judge Stone issued an order for the Attorney General and other state officials to show cause why they should not be held in contempt for refusing to comply with the court's order to issue an amended birth certificate. On May 16, 2014, the Utah Supreme Court issued an order staying enforcement of the state court orders and stating that a briefing schedule on the writ would be set.

Plaintiffs JoNell Evans and Stacia Ireland also obtained a marriage license and solemnized their marriage on December 20, 2013. Evans and Ireland had been in a relationship for 13 years. In 2007, they had a religious marriage ceremony at the Unitarian Church in Salt Lake City, but the marriage was not recognized by the State of Utah.

Evans and Ireland have tried to obtain rights through the use of medical powers of attorney because Ireland has had serious health issues recently. In 2010, Ireland suffered a heart attack. With the power of attorney, Evans was allowed to stay with Ireland during her treatment but did not feel as though she was given the same rights as a spouse. On January 1, 2014, Evans again had to rush Ireland to the hospital emergency room because Ireland was experiencing severe chest pains. Unlike her previous experience, Evans was afforded all courtesies and rights given to the married spouse of a patient. Now that the State no longer recognizes their marriage, Evans does not know how she will be treated if there is another medical situation.

Plaintiffs Donald Johnson and Karl Fritz Shultz got their marriage license and solemnized their marriage on December 23, 2013, after waiting in line for approximately eight hours. Johnson and Shultz have been in a relationship for over 21 years. Johnson first proposed to Shultz the Sunday after Thanksgiving in 1992, and the couple had continued to celebrate that day

as their anniversary.  Johnson researched insurance coverage for himself and Shutlz and

discovered that they could save approximately $8,000.00 each year on health insurance.  They

will lose that savings without state recognition of their marriage.

## LEGAL ANALYSIS

### Plaintiffs' Motion for Preliminary Injunction

Plaintiffs seek a preliminary injunction requiring the State to continue recognizing the

marriages Plaintiffs entered into pursuant to valid Utah marriage licenses between December 20,

2013, and January 6, 2014.  The State continues to recognize Plaintiffs' marriages for purposes

of joint state tax filings for 2013 and already-issued state documents with marriage-related name

changes.  However, for all other purposes, the State is applying its marriage bans retroactively to

Plaintiffs' marriages.  Plaintiffs seek an injunction requiring the State to continue recognizing

their marriages as having all the protections and responsibilities given to all married couples

under Utah law.

## I.  Preliminary Injunction Standard

Preliminary injunctive relief is appropriate if the moving party establishes: "(1) a

likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm

in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor;

and (4) that the injunction is in the public interest."  *Roda Drilling Co. v. Siegal*, 552 F.3d 1203,

1208 (10th Cir. 2009).  Because a preliminary injunction is an extraordinary remedy, the "right to

relief must be clear and unequivocal."  *SCFC LLC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098

(10th Cir. 1991).

In the Tenth Circuit, certain types of injunctions are disfavored: "(1) preliminary

injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary

injunctions that afford the movant to all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. University of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004). "Such disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of that case support the granting of a remedy that is extraordinary even in the normal course.'" *Id*. "Movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard." *O Centro*, 389 F.3d at 976. The moving party must make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Awad v. Ziriax*, 670 F.3d 111, 1125 (10th Cir. 2012).

The status quo for purposes of a preliminary injunction is "the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *Schrier*, 427 F.3d at 1260. In this case, the last peaceable uncontested status between the parties was when the State recognized Plaintiffs' marriages. Therefore, the requested preliminary injunction does not disturb the status quo.

However, the State argues that Plaintiffs' requested preliminary injunction is a disfavored injunction because it is mandatory rather than prohibitory. An injunction is mandatory if it will "affirmatively require the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Id.* at 1261. The Tenth Circuit has recognized that "[t]here is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing." *O Centro*, 389 F.3d at 1006. "'In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular

manner may be tantamount to a proscription against performing in any other.'" *Id.* (citation omitted).

In this case, the court could characterize Plaintiffs' requested injunction as prohibiting the State from enforcing its marriage bans against couples who already have vested marriage rights or affirmatively requiring the State to recognize Plaintiffs' vested marriage rights. In large part, it is a matter of semantics rather than substance. Preventing the State from applying its marriage bans retroactively is the same thing as requiring the State to recognize marriages that were entered into when such marriages were legal.

As to the second element of a mandatory injunction, however, there is no evidence to suggest that this court would be required to supervise the State if the court granted Plaintiffs' requested injunction. The State's position is that it is required by Utah law to apply Utah's marriage bans to all same-sex marriages until a court decides the issue. The Directive that went to Governor Herbert's cabinet stated that the "legal status" of the same-sex marriages that took place before the Supreme Court stay was "for the courts to decide." And Attorney General Reyes recognized that the validity of the marriages in question must ultimately be decided by the legal process. Based on the State's compliance with the injunction in *Kitchen* prior to the Supreme Court's Stay Order, there is no basis for assuming that the State would need supervision in implementing an order from this court recognizing the same-sex marriages.

Neither party raised the issue of whether this is an injunction that would provide Plaintiffs with all the relief they could receive from a trial on the merits. Plaintiffs seek declaratory and injunctive relief that their marriages continue to be valid under Utah and federal law. However, Plaintiffs have pleaded a cause of action for the deprivation of property and liberty interests in violation of the United States Constitution under 42 U.S.C. § 1983. A determination that the

State has deprived Plaintiffs of their constitutional rights could, therefore, result in at least nominal damages at trial.[3]

The court concludes, therefore, that the requested injunction is not a disfavored injunction which would require the clear and unequivocal standard to apply to the likelihood of success on the merits element. Based on this court's analysis, the preliminary injunction does not alter the status quo, is not mandatory, and does not afford Plaintiff all the relief that could be awarded at trial. However, to the extent that the requested injunction could be construed as a mandatory injunction, the court will analyze the likelihood of success on the merits under the clear and unequivocal standard.

## II. Merits

Because the court is applying the heightened standard to Plaintiffs' request for a preliminary injunction, the court will address the likelihood of success on the merits first and then each element in turn.

### A.    Likelihood of  Success on the Merits

Plaintiffs argue that they are likely to succeed on their state and federal claims because they became vested in the rights attendant to their valid marriages at the time those marriages were solemnized and the State is required, under the state and federal due process clauses, to continue recognizing their marriages despite the fact that Utah's same-sex marriage bans went back into effect on January 6, 2014. In their Complaint, Plaintiffs bring causes of action for violations of their due process and liberty interests under the Utah and United States

---

[3] Plaintiffs allege financial damages due to a deprivation of rights, such as Johnson and Shutlz's $8,000.00 yearly loss for insurance premiums. Plaintiffs, however, do not specifically request monetary damages in their Prayer for Relief. Rather, Plaintiffs state only "any other relief the court deems just and proper."

Constitutions. Article I, Section 7 of the Utah Constitution provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." The Fourteenth Amendment to the United States Constitution guarantees that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Utah Supreme Court has recognized that "the standards for state and federal constitutional claims are different because they are based on different constitutional language and different interpretive law." *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 477 (Utah 2011). While the language may be similar, the Utah Supreme Court has explained that federal standards do not "foreclose [its] ability to decide in the future that [its] state constitutional provisions afford more rights than the federal Constitution." *Id.* at 478 (concluding that conduct that did not give rise to a federal constitutional violation could still give rise to a state constitutional violation). Recognizing that the Utah Supreme Court has the prerogative to find that the state due process clause affords more protections, the court will analyze the issue under only federal due process standards.

As an initial matter, the court notes that this case is not about whether the due process clause should allow for same-sex marriage in Utah or whether the *Kitchen* decision from this District was correct. That legal analysis is separate and distinct from the issues before this court and is currently on appeal to the Tenth Circuit Court of Appeals. This case deals only with whether Utah's marriage bans preclude the State of Utah from recognizing the same-sex marriages that already occurred in Utah between December 20, 2013, and January 6, 2014.

Plaintiffs bring their federal violation of due process and liberty interests claim under 42

U.S.C. § 1983.  While Section 1983 "does not provide any substantive rights" of its own, it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979); *Baker v. Mccollan*, 443 U.S. 137, 144 n.3 (1979).

"To state a claim for a violation of due process, plaintiff must first establish that it has a protected property interest and, second, that defendants' actions violated that interest."  *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003).  "The Supreme Court defines 'property' in the context of the Fourteenth Amendment's Due Process Clause as a 'legitimate claim of entitlement' to some benefit."  *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  These claims of entitlement generally "arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings."  *Dickeson v. Quarberg*, 844 F.2d 1435, 1437 (10th Cir. 1988).  In assessing a due process claim, the Tenth Circuit has recognized that "a liberty interest can either inhere in the Due Process Clause or it may be created by state law."  *Elwell v. Byers*, 699 F.3d 1208, 1213 (10th Cir. 2012).

### 1. Interest Inherent in the Due Process

In finding a liberty interest inherent in the Due Process Clause, the Tenth Circuit explained that "[t]here can be no doubt that 'freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.'"  *Id.* at 1215 (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974)).  "As the Court declared in *Meyer v. Nebraska*, 262 U.S. 390 (1923), the liberty guaranteed by the Due Process Clause 'denotes not merely freedom from bodily restraint but also

the right of the individual . . . to marry, establish a home and bring up children." *Id.*

In *Windsor*, the United States Supreme Court struck down the federal Defense of Marriage Act because it was "unconstitutional as a deprivation of the liberty of the person protected by" the Due Process Clause. *Id.* In prior cases, the court has also found that "the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." *Lehr v. Robertson*, 463 U.S. 248, 258 (1983).

In this case, Plaintiffs solemnized legally valid marriages under Utah law as it existed at the time of such solemnization. At that time, the State granted Plaintiffs all the substantive due process and liberty protections of any other marriage. The *Windsor* Court held that divesting "married same-sex couples of the duties and responsibilities that are an essential part of married life" violates due process. *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).

As in *Windsor*, the State's decision to put same-sex marriages on hold, "deprive[s] some couples married under the laws of their State, but not other couples, of both rights and responsibilities." *Id.* at 2694. Similarly, the "principal effect" of the State's actions "is to identify a subset of state-sanctioned marriages and make them unequal." The court, therefore, concludes that under Tenth Circuit law, Plaintiffs have demonstrated a liberty interest that inheres in the Due Process Clause.

### 2. Interest Created by State Law

Plaintiffs have also asserted that they have a state property interest in their valid marriages under Utah state law. The only state court to look at an issue similar to the one before this court is the California Supreme Court in *Strauss v. Horton*, 207 P3d 48 (Cal. 2009). The *Strauss* court addressed the continuing validity of the same-sex marriages that occurred after the California Supreme Court decision allowing same-sex marriage under the California Constitution

14

and the passage of Proposition 8, which amended the California Constitution to preclude same-sex marriages. *Id.* at 119-22. The *Strauss* court began its analysis by recognizing the presumption against finding an enactment to have retroactive effect and examining the language of Proposition 8 to determine whether the amendment could be applied retroactively. *Id.* at 120-21. The court concluded that Proposition 8 did not apply retroactively. *Id.*

In making its determination on retroactivity, the court also acknowledged that its "determination that Proposition 8 cannot properly be interpreted to apply retroactively to invalidate lawful marriages of same-sex couples that were performed prior to the adoption of Proposition 8 is additionally supported by our recognition that a contrary resolution of the retroactivity issue would pose a serious potential conflict with the state constitutional due process clause." *Id.* at 121.

The *Strauss* court explained that its "past cases establish that retroactive application of a new measure may conflict with constitutional principles 'if it deprives a person of a vested right without due process of law.'" *Id.* (citations omitted). "In determining whether a retroactive law contravenes the due process clause," the court must "consider such factors as the significance of the state interest served by the law, the importance of the retroactive application of the law to the effectuation of that interest, the extent of reliance upon the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which the retroactive application of the new law would disrupt those actions." *Id.*

Applying these principles to whether the same-sex marriages entered into prior to Proposition 8 should remain valid, the *Strauss* court concluded that applying Proposition 8 retroactively "would create a serious conflict between the new constitutional provision and the protections afforded by the state due process clause." *Id.* at 122. The court reasoned that the

same-sex couples "acquired vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances." *Id.* Furthermore, the couples' reliance was "entirely legitimate," and "retroactive application of the initiative would disrupt thousands of actions taken in reliance on the [prior court ruling] by these same-sex couples, their employers, their creditors, and many others, throwing property rights into disarray, destroying the legal interests and expectations of thousands of couples and their families, and potentially undermining the ability of citizens to plan their lives according to the law as it has been determined by this state's highest court." *Id.* "By contrast, a retroactive application of Proposition 8 is not essential to serve the state's current interest (as reflected in the adoption of Proposition 8) in preserving the traditional definition of marriage by restricting marriage to opposite-sex couples; that interest is honored by applying the measure prospectively and by having the traditional definition of marriage enshrined in the state Constitution where it can be altered only by a majority of California voters." *Id.*

In this case, the State seeks to apply its marriage bans retroactively to Plaintiff's previously-entered marriages. The marriage bans were legal nullities at the time Plaintiffs were married. However, once the Supreme Court entered its Stay Order, the State asserts that the marriage bans went back into effect.

Like California, Utah law has a strong presumption against retroactive application of laws. "Constitutions, as well as statutes, should operate prospectively only unless the words employed show a clear intention that they should have a retroactive effect." *Shupe v. Wasatch Elec. Co.*, 546 P.2d 896, 898 (Utah 1976). The presumption against retroactive application of changes in the law is deeply rooted in principles of fairness and due process. The United States Supreme Court has explained that "the presumption against retroactive legislation . . . embodies a

legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). "The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Id.*

Because retroactive application of a law is highly disfavored, "a court will and ought to struggle hard against a construction which will, by retrospective operation, affect the rights of parties." *Thomas v. Color Country Mgmt.*, 84 P.3d 1201, 1210 (Utah 2004) (Durham, C.J., concurring). Utah's presumption against retroactivity can be overcome only by "explicit statements that the statute should be applied retroactively or by clear and unavoidable implication that the statute operates on events already past." *Evans & Sutherland Computer Corp. v. Utah State Tax Comm'n*, 953 P.2d 435, 437 (Utah 1997).

In this case, Utah's statutory and constitutional provisions do not explicitly state that they apply retroactively. Utah Code Section 30-1-2 states that marriages "between persons of the same sex" "are prohibited and declared void." Utah Code Ann. § 30-1-2(5). Utah Code Section 30-1-4.1 provides: "It is the policy of this state to recognize as marriage only the legal union of a man and a woman;" and "this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties [to same-sex couples] that are substantially equivalent to those provided under Utah law to a man and woman because they are married." *Id.* § 30-1-4.1(1)(a), (b). Article I, Section 29 to the Utah Constitution provides: "(1) Marriage consists of only the legal union between a man and a woman. (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect."

The use of the present tense in these same-sex marriage bans indicates that the bans do not apply retroactively. In *Waddoups v. Noorda*, 2013 UT 64, the Utah Supreme Court stated: "It

simply cannot be said that the use of the present tense communicates a clear and unavoidable implication that the statute operates on events already past. If anything, use of the present tense implies an intent that the statute apply to the present, as of its effective date, and continuing forward." *Id.* at ¶ 7.

The *Waddoup* court's analysis is consistent with the *Strauss* court's conclusion that Proposition 8's use of the present tense did not retroactively apply to prior marriages because "a measure written in the present tense ('is valid or recognized') does not clearly demonstrate that the measure is intended to apply retroactively." *Strauss*, 207 P.3d at 120. The *Waddoup*'s decision is further consistent with other courts concluding that statutes stating that a marriage "is prohibited and void" does not apply retroactively. *See Cook v. Cook*, 104 P.3d 857, 865 n.2 (Ariz. Ct. App. 2005) (finding "[m]arriage . . . between first cousins is prohibited and void" does not apply retroactively); *Succession of Yoist*, 61 So. 384, 385 (La. 1913) (statute declaring, "Marriages between white persons and persons of color are prohibited, and the celebration of such marriages is forbidden, and such celebration carries with it no effect, and is mull and void," does not apply retroactively).

Thus, the use of present and future tenses in Utah's marriage bans does not provide a "clear and unavoidable" implication that they "operate on events already past." *Waddoups*, 2013 UT at ¶ 7. The court concludes that, under Utah law, nothing in the language of Utah's marriage bans indicates or implies that the bans should or can apply retroactively.

Moreover, nothing in the United States Supreme Court's Stay Order speaks to the legal status of the marriages that had already taken place or whether Utah's marriage bans would have retroactive effect when they were put back in place. While the State asserts that the Stay Order placed the marriage bans back into effect as of December 20, 2013, the State cites to no language

in the Stay Order that would support that assertion. In addition, the State has not presented any case law indicating that a Stay Order has that effect.

The State argues that application of Utah's previously existing marriage bans after the Supreme Court's Stay Order is not retroactive application of the bans because the laws were enacted long before Plaintiffs entered into their marriages. However, this argument completely ignores the change in the law that occurred. The marriage bans became legal nullities when the *Kitchen* decision was issued and were not reinstated until the Stay Order. In addition, the State's argument fails to recognize that Utah law defines a retroactive application of a law as an application that "'takes away or impairs vested rights acquired under existing laws . . . in respect to transactions or considerations already past.'" *Payne By and Through Payne v. Myers*, 743 P.2d 186, 190 (Utah 1987). Under this definition, the State's application of the marriage bans to place Plaintiffs' marriages "on hold," necessarily "takes away or impairs vested rights acquired under existing law."

When discussing the due process concerns implicated in a retroactive application of Proposition 8, the *Strauss* court had clear California precedents to rely upon that identified the state's recognition of vested rights in marriage. 207 P.3d at 121. In this case, however, the State disputes whether Plaintiffs have vested rights in their marriages under Utah law.

Under Utah law, a marriage becomes valid on the date of solemnization. *See Walters v. Walters*, 812 P.2d 64, 68 (Utah Ct. App. 1991); *State v. Giles*, 966 P.2d 872, 877 (Utah Ct. App. 1998) (marriage valid from date of solemnization, even if officiant does not return certificate to county clerk). There is no dispute in this case that Plaintiffs' marriages were valid under the law as it existed at the time they were solemnized. In *Miller v. USAA Cas. Ins. Co.*, 44 P.3d 663, 674 (Utah 2002), the Utah Supreme Court recognized that the due process protection in the Utah

Constitution "is not confined to mere tangible property but extends to every species of vested rights." And, as early as 1892, the Utah Supreme Court recognized the fundamental vested rights associated with marriage. *Tufts v. Tufts*, 30 P. 309, 310 (Utah 1892).

In *Tufts v. Tufts*, the court addressed the retroactive application of divorce laws and stated that the rights and liabilities of spouses "grew out of a contract governing the marriage relation which existed at the time" the alleged conduct occurred. *Id.* The court relied on precedent stating that "[w]hen a right has arisen upon a contract, or a transaction in the nature of a contract, authorized by statute, and has been so far perfected that nothing remains to be done by the party asserting it, the repeal of the statute does not affect it, or any action for its enforcement. It has then become a vested right, which stands independent of the statute." *Id.* The court also stated that the rights and liabilities of spouses are "sacred" and, "while the relation is based upon contract," "it is a contract that differs from all others, and is the basis of civilized society." *Id.* at 310-11.

In this case, Plaintiffs' marriages were authorized by law at the time they occurred. The marriages were solemnized and valid under the existing law so that nothing remained to be done. No separate step can or must be taken after solemnization for the rights of a marriage to vest. Moreover, Plaintiffs began to exercise the rights associated with such valid marriages prior to the entry of the Supreme Court's Stay Order. As in *Tufts*, therefore, the change in the law does not affect the vested rights associated with those marriages. The vested rights in Plaintiffs' validly-entered marriages stand independent of the change in the law. For over a hundred years, the *Tufts* decision has never been called into question because it states a fundamental principle of basic fairness.

This application of Utah law is consistent with the *Strauss* court's recognition that the

"same-sex couples who married after the [court's] decision in the Marriage Cases . . . and before Proposition 8 was adopted, acquired vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances." 207 P.3d at 121. Moreover, the State has failed to cite any law from any jurisdiction supporting the proposition that rights in a valid marriage do not vest immediately upon valid solemnization of the marriage.

Plainly, to deprive Plaintiffs of the vested rights in their validly-entered marriages raises the same due process concerns that were addressed in *Strauss*. The State argues that Plaintiffs in this case do not have a property interest in their marriages because their right to marry was based on a non-final district court opinion instead of a decision by the state's highest court as in *Strauss*. To make this argument, however, the State cites to cases involving non-final consent decrees that are factually distinct from a final district court judgment and that are wholly irrelevant to the issue before this court.

While a factual difference exists between this case and *Strauss*, the court finds no basis for legally distinguishing between the final judgment in *Kitchen* and the California Supreme Court's decision in its marriage cases. Both decisions allowed for same-sex couples to marry legally. "[A]n appeal from a decree granting, refusing or dissolving an injunction does not disturb its operative effects." *Hovey v. McDonald*, 109 U.S. 150, 161 (1883). "The general rule is that the judgment of a district court becomes effective and enforceable as soon as it is entered; there is no suspended effect pending appeal unless a stay is entered." *In re Copper Antitrust Litig.*, 436 F.3d 782, 793 (7th Cir. 2006).

The State's arguments as to Plaintiffs' reliance on the final judgment in *Kitchen* also ignore the fact that Plaintiffs are claiming a vested right in their validly-entered legal marriages.

Plaintiffs are not claiming they have a vested right in the continuation of the *Kitchen* injunction or judgment. Plaintiffs contend that their rights vested upon the solemnization of their valid marriages and that their validly-entered marriages do not rely on the continuation or reinstatement of the *Kitchen* injunction. Thus Plaintiffs seek recognition of their marriages separate and apart from the ultimate outcome of the *Kitchen* appeals.

Plaintiffs' claims, therefore, are factually and legally distinguishable from the cases the State cites applying the "vested rights doctrine." *See Axel Johnson, Inc. v. Arthur Andersen & Co.,* 6 F.3d 78 (2d Cir. 1993); *Casiano-Montanez v. State Ins. Fund Corp.*, 707 F.3d 124 (1st Cir. 2013). In those cases, the plaintiffs were relying on rights fixed by a district court judgment, whereas, Plaintiffs, in this case, are relying on the validity of their marriage licenses. The State, in this case, issued and recognized Plaintiffs' marriage licenses, which became valid under Utah law when the marriages were solemnized. The State did not issue provisionally-valid marriage licenses. Moreover, Plaintiffs' vested rights in their legally recognized marriages are not dependent on the ultimate outcome in *Kitchen.* Whether or not *Kitchen* is ultimately upheld, the district court's injunction was controlling law and Utah's marriage bans were a legal nullity until the Supreme Court issued the Stay Order on January 6, 2014. *See Howat v. State of Kansas*, 258 U.S. 181, 189-90 (1922) ("An injunction duly issuing out of a court . . . must be obeyed . . . however erroneous the action of the court may be.").

The State further argues that Plaintiffs' marriages can be declared legal nullities if the *Kitchen* decision is overturned because the law has recognized instances when traditional marriages thought to be valid are later declared legal nullities. However, the instances in which courts have declared such marriages void involve mistakes of fact. In *Van Der Stappen v. Van Der Stappen*, 815 P.2d 1335, 1338 (Utah Ct. App. 1991), the wife discovered that she had not

completed a previous divorce at the time of her subsequent marriage. In the present case, the marriages were valid under the law at the time they were solemnized and there is no alleged mistake of fact. Therefore, the comparison is inapposite. Cases involving marriages that were invalid at their inception are not helpful or relevant. This case is also distinguishable from cases where county clerks spontaneously started issuing same-sex marriage licenses without any court order or basis in state law. Unlike the cases before this court, those cases were also invalid at their inception.

The more analogous case is presented in *Cook v. Cook*, where the court recognized that refusing to recognize an out-of-state marriage that had previously been recognized within the state would violate constitutional due process guarantees. 104 P.3d 857, 866 (Ariz. App. 2005). In *Cook*, the statutory scheme in place when the couple moved to the state expressly allowed the marriage, but a subsequent amendment made such a marriage void. *Id.* The court refused to find all such marriages in the state on the date of the amendment void because the couples in the state with such marriages already had constitutionally vested rights in their marriages. *Id.*

The State believes that all the actions taken in response to the final judgment in *Kitchen* can be considered a nullity if the decision is ultimately overturned. However, there are several instances in which courts recognize that actions taken in reliance on an injunction cannot be reversed. *See University of Texas v. Camenisch*, 451 U.S. 390, 398 (1981) (injunctions have legal effects that will be "irrevocably carried out" and cannot be unwound if the injunction is subsequently overturned on appeal); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001) (recognizing certain types of injunctions "once complied with, cannot be undone"). Moreover, a person who disobeys a district court injunction that has not been stayed may be punished with contempt even if the underlying injunction is subsequently

reversed.  *Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967).

The State further fails to recognize that Plaintiffs are claiming a violation of substantive due process rights, not merely procedural due process rights.  Plaintiffs allege that they have substantive vested rights in their marriages–such as, the right to family integrity, the right to the custody and care of children of that marriage–that the State cannot take away regardless of the procedures the State uses.  Once Plaintiffs solemnized a legally valid marriage between December 20, 2013, and January 6, 2014, Plaintiffs obtained all the substantive due process and liberty protections of any other marriage.

As stated above, the Supreme Court recently held that divesting "married same-sex couples of the duties and responsibilities that are an essential part of married life" violates due process.  *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).  The State's decision to put same-sex marriages on hold, "deprive[s] some couples married under the laws of their State, but not other couples, of both rights and responsibilities."  *Id.* at 2694.

Prior Supreme Court cases also establish that there "is a sphere of privacy or autonomy surrounding an existing marital relationship into which the State may not lightly intrude." *Zablocki v. Redhail*, 434 U.S. 374, 397 n.1 (1978) (Powell, J., concurring).[4]  The State has not attempted to argue that they have a constitutionally adequate justification for overcoming Plaintiffs' due process and liberty interests.  *Lawrence v. Texas*, 539 U.S. 558, 593 (2003) (Ordinarily, "the Due Process Clause prohibits States from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest.") The State has not provided the court with a compelling state interest for divesting Plaintiffs of the

---

[4] Utah courts have also recognized "[t]he rights inherent in family relationships–husband-wife, parent-child, and sibling–are the most obvious examples of rights" protected by the Constitution.  *In re J.P.*, 648 P.2d 1364, 1373 (Utah 1982).

substantive rights Plaintiffs obtained in their marriages. The State asserts merely that Plaintiffs improperly relied on the ruling of a United States District Court. The State's argument, however, fails to acknowledge that the State also relied on the *Kitchen* decision. The State notified its county clerks that they were required to issue marriage licenses. The State now seems to be claiming that while it reasonably required its county clerks to act in response to the *Kitchen* decision, Plaintiffs unreasonably acted on that same decision. However, the court has already discussed the operative effect of a district court injunction. That operative effect applies to all parties equally.

Even though the Supreme Court's Stay Order put Utah's marriage bans back in place, to retroactively apply the bans to existing marriages, the State must demonstrate some state interest in divesting Plaintiffs of their already vested marriage rights. The State has failed to do so. Although the State has an interest in applying state law, that interest is only in applying the controlling law at the time. In *Strauss*, the court found that a retroactive application of Proposition 8 was "not essential to serve the state's current interest (as reflected in the adoption of Proposition 8) in preserving the traditional definition of marriage by restricting marriage to opposite-sex couples; that interest is honored by applying the measure prospectively and by having the traditional definition of marriage enshrined in the state Constitution." 207 P.3d at 122. In comparison, "a retroactive application of the initiative would disrupt thousands of actions taken in reliance on the *Marriage Cases* by these same-sex couples, their employers, their creditors, and many others, throwing property rights into disarray, destroying the legal interests and expectations of thousands of couples and their families, and potentially undermining the ability of citizens to plan their lives according to the law as it has been determined." *Id.*

As in *Strauss*, this court concludes that the State has not demonstrated a state interest that

would overcome Plaintiffs' vested marriage rights. The State's decision to retroactively apply its marriage bans and place Plaintiffs' marriages "on hold" infringes upon fundamental constitutional protections for the marriage relationship. Therefore, Plaintiffs have demonstrated a clear and unequivocal likelihood of success on the merits of their deprivation of federal due process claim under 42 U.S.C. § 1983.

### B.        Irreparable Harm

Under Tenth Circuit law, "[t]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The State argues that the court should not find irreparable harm because, even though Plaintiffs have the option of living in a state that would recognize their marriage, Plaintiffs have chosen to live in Utah for years without enjoying the rights of marriage. This argument ignores the changes in the law that occurred and the fact that Plaintiffs' situations were materially altered when they became validly married in the State of Utah.

The Tenth Circuit recognizes that "'[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). As stated above, Plaintiffs have demonstrated a likelihood of success on the merits that the State is violating their due process and liberty interests by refusing to recognize their validly-entered marriages. The State has placed Plaintiffs and their families in a state of legal limbo with respect to adoptions, child care and custody, medical decisions, employment and health benefits, future tax implications, inheritance, and many other property and fundamental rights associated with marriage. These legal uncertainties and lost rights cause harm each day that the marriage is not recognized. The court concludes that these circumstances

meet the irreparable harm standard under Tenth Circuit precedents.

### C.     Balance of Harms

"[I]f the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). In this case, the laws themselves may not be unconstitutional, but the State's retroactive application of the marriage bans likely violates Plaintiffs' constitutional rights. The State has no legitimate interest in depriving Plaintiffs of their constitutional rights.

Although the State has a general interest in representing the wishes of its voters, that interest does not outweigh the harms Plaintiffs face by having their constitutional rights violated. Plaintiffs face significant irreparable harms to themselves and their families–inability to inherit, inability to adopt, loss of custody, lost benefits. The State, however, has demonstrated no real harm in continuing to recognize Plaintiffs' legally-entered marriages. The State's harm in the *Kitchen* litigation with respect to continuing to issue same-sex marriage licenses is not the same as the harm associated with recognizing previously-entered same-sex marriages that were valid at the time they were solemnized. The only relevant harm in this case is the harm that results from requiring the State to recognize Plaintiffs' marriages.

The State asserts that it is harmed by not being able to enforce the marriage bans retroactively. But the court has already discussed the constitutional concerns associated with a retroactive application of the marriage bans and finds no harm to the State based on an inability to apply the marriage bans retroactively. The State's marriage bans are currently in place and can

stop any additional marriages from occurring. The State's interest is in applying the current law. The court, therefore, concludes that the balance of harms weighs decidedly in Plaintiffs' favor and supports the court's issuance of a preliminary injunction.

### D. Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. In this case, the court agrees with Plaintiffs that the public is well served by having certainty about the status of Plaintiffs' marriages. That certainty not only benefits Plaintiffs and there families but State agencies, employers, and other third parties who may be involved in situations involving issues such as benefits, employment, inheritance, child custody, and child care.

For the foregoing reasons, the court concludes that Plaintiffs have met the clear and unequivocal standard for obtaining a preliminary injunction during the pendency of this litigation. Plaintiffs have demonstrated that they are likely to succeed on the merits of their federal due process claims, that they will be irreparably harmed if a preliminary injunction does not issue, that the balance of harms weighs in their favor, and that the injunction is in the public interest. Accordingly, Plaintiffs' motion for a preliminary injunction is granted and the court will enter a preliminary injunction preventing the State from enforcing its marriage bans with respect to the same-sex marriages that occurred in Utah between December 20, 2013, and January 6, 2014.

### The State's Request for Stay Pending Appeal

In the event that the court decided to grant Plaintiffs' motion for a preliminary injunction, the State requested that the court stay the injunction pending appeal. Rule 62(c) provides that "[w]hile an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the

court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Rule 8(a)(1) of the Federal Rules of Appellate Procedure provides that a party must ordinarily first move in the district court to obtain a stay of the judgment or order of a district court pending appeal. Fed. R. App. P. 8(a)(1).

The purpose of a stay is to preserve the status quo pending appeal. *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir. 1996). The court has already determined that the status quo in this case is the State recognizing Plaintiffs' marriages. Therefore, the State's request would alter the status quo.

The court considers the following four factors when considering a motion to stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). "With respect to the four stay factors, where the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success' requirement is somewhat relaxed.'" *F.T.C. v. Mainstream Marketing Services, Inc.*, 345 F.3d 850, 852 (10th Cir. 2003) (citations omitted). If the State "can meet the other requirements for a stay pending appeal, they will be deemed to have satisfied the likelihood of success on appeal element if they show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation.'" *McClendon*, 79 F.3d at 1020 (quoting *Walmer v. United States Dep't of Defense*, 52 F.3d 851, 854 (10th Cir.), *cert. denied*, 516 U.S. 974, 116 S. Ct. 474, 133 L. Ed. 2d 403 (1995).

Based on the court's analysis above, this court believes that its decision is correct and that Plaintiffs, not the State, have demonstrated a clear likelihood of success on the merits.  Also, the court has already weighed and balanced the harms involved in issuing its preliminary injunction.  Plaintiffs have demonstrated existing clear and irreparable harms if an injunction is not in place.  As discussed above, the balance of harms is necessarily tied to the merits of the decision because harm to Plaintiffs' constitutional rights are given significantly more weight than the State's harm in not being able to apply its marriage bans retroactively to legally-entered marriages.  The irreparable nature of Plaintiffs harms involve fundamental rights such as the ability to adopt, the ability to inherit, child care and custody issues, and other basic rights that would otherwise remain in legal limbo.  For these reasons, the court cannot conclude that the harm to the State outweighs the harm to Plaintiffs during pendency of the appeal.  The need for certainty also weighs heavily in determining the public interest.  Recognition of Plaintiffs' marriages impacts extended families, employers, hospitals, schools, and many other third parties.  The court, therefore, concludes that the State has not met its burden of establishing the factors required for a stay pending appeal.

In its discretion, however, the court grants the State a limited 21-day stay during which it may pursue an emergency motion to stay with the Tenth Circuit.  The court recognizes the irreparable harms facing Plaintiffs every day.  However, the court finds some benefit in allowing the Tenth Circuit's to review whether to stay the injunction prior to implementation of the injunction.  Therefore, notwithstanding the many factors weighing against a stay, the court, in its discretion, grants the State a temporary 21-day stay.

## Motion to Certify Questions of State Law

In addition to their Motion for a Preliminary Injunction, Plaintiffs also ask the court to

certify questions of law to the Utah Supreme Court. Specifically, Plaintiffs ask the court to certify two specific questions: (1) Under Utah law, do same-sex couples who were legally married between December 20, 2013, and January 6, 2014, have vested rights in their marriages which are protected under Article I, Section 7 of the Utah Constitution?; and (2) Once the State of Utah recognized the marriages of same-sex couples entered into between December 20, 2013, and January 6, 2014, could it apply Utah's marriage bans to withdraw that recognition?

The State opposed Plaintiffs' motion to certify but has now brought its own Motion to Certify, asking the court to certify the following question: Do same-sex couples who received marriage licenses, and whose marriages were solemnized, between December 20, 2013 and January 6, 2014, have vested property rights in their marriages which now require recognition under present Utah law?

The State opposed Plaintiffs' motion to certify on the grounds that the answers to Plaintiffs' proposed questions were clear and the questions were vague and unhelpful to the court. However, after briefing and argument on Plaintiffs' motion to certify, the State alleges that circumstances changed when some district court judges in Utah's state courts began ruling that Plaintiffs had vested rights in their marriages.

Rule 41(a) of the Utah Rules of Appellate Procedure provides that "the Utah Supreme Court may answer a question of Utah law certified to it by a court of the United States when requested to do so by such certifying court . . . if the state of the law of Utah applicable to a proceeding before the certifying court is uncertain." Utah R. App. P. 41(a). The certification order must state (1) the "question of law to be answered," (2) "that the question certified is a controlling issue of law in a proceeding pending before the certifying court," and (3) "that there appears to be no controlling Utah law." *Id.* 41(c).

The parties' requests to certify come to this court in a fairly unusual procedural posture. Claiming that the heart of Plaintiffs' claims is whether the State's failure to recognize their marriages violates the Due Process Clause of the Fourteenth Amendment, the State removed Plaintiffs' case from state court to federal court. The State then opposed Plaintiffs' motion to certify question to the state court. Now, based on rulings favorable to Plaintiffs in state district courts, the State argues that this court should certify the vested right question to the Utah Supreme Court "to ensure consistency and fairness."

As demonstrated by the parties' competing motions, both parties in this case seek a determination from the Utah Supreme Court as to whether Plaintiffs have vested rights in their marriages under Utah law. In determining Plaintiffs' federal due process claim, this court concluded that Plaintiffs have liberty interests inherent in the Due Process Clause and created by state law. Therefore, the vested rights issue is an important issue of law in this case, but it does not appear to be essential to Plaintiffs' federal due process claim. However, with respect to the final requirement for certification – that there is no controlling Utah law – this court concluded that, under Utah state law, Plaintiffs clearly and unequivocally demonstrated that they have vested rights in their legally-entered marriages and their vested marriage rights are protected by the federal due process clause regardless of the ultimate outcome of the *Kitchen* case.

The State asserts that this court should certify the vested rights question to the Utah Supreme Court because state district court judges in several adoption cases have ruled that Plaintiffs' have vested marriage rights and the State has sought review of those decisions through a writ to the Utah Supreme Court. Although the Utah Supreme Court has granted a stay of the adoption decrees while it considers the issue, the court's decision to have the issue briefed makes no comment on the merits of the writs. As Plaintiffs' asserted in their oppositions, there may be

procedural grounds for dismissal or denial of the writs that would preclude the Utah Supreme Court from reaching the merits of the issue.

The State asserts that this court could have determined the state law enmeshed with the federal due process challenge but for the state adoption rulings. This court, however, is not aware of any case in the Utah state courts that have been favorable to the State's position. At most, some district courts have chosen to stay the adoption cases pending a decision on the validity of the marriages. Several state rulings consistent with this court's determination that Plaintiffs have vested rights in their marriages does not provide a basis for concluding that the issue of state law is uncertain.

Finally, if the court is to consider fairness as the State requests, the court notes that the State chose this forum by removing the action from state court. Unlike Plaintiffs who seek certification in order to obtain favorable rulings from both courts, the State seeks to begin the process anew in a different forum from the one it chose. The court agrees with Plaintiffs that the State's late-filed motion to certify, asserting a nearly identical question to those posed by Plaintiffs, appears to be a delay tactic.[5]

---

[5] The State includes a footnote in its motion to certify stating that the factors warranting the application of the *Colorado River* abstention doctrine apply in this case. *See Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800 (1976). However, this case and the current state proceedings are not parallel actions. *See Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994) ("[A] federal court must first determine whether the state and federal proceedings are parallel."). The state actions were instituted as adoption proceedings and are before the Utah Supreme Court on emergency writs. The case before this court is a deprivation of due process and liberty interest under state and federal due process. Only one couple in the adoption proceedings overlap with the Plaintiffs in this case. Also, significantly, the rights and remedies at issue in this case are far broader than those at issue in the state court proceedings. Moreover, the only reason both cases are not in State court is because the State removed this case from State court. It strikes the court as procedural gamesmanship for the State to remove a case to federal court and then ask the court in the forum the State chose to abstain from acting. "The decision whether to defer to the state courts is necessarily left to the discretion of the district court in the first instance." *Id.* at 1081. Such discretion must be exercised "in light of 'the virtually

Utah law clearly provides that rights in a valid marriage vest immediately upon solemnization. There is no further action required to be taken or that could be taken by either party to create the vested right. There is no basis under Utah law for finding that Plaintiffs in this case were required to take steps beyond solemnization in order to obtain vested rights when such steps are not required for other marriages. Because Utah law is clear and not ultimately controlling of the case before this court, the court concludes that there is no basis for certifying the state law questions to the Utah Supreme Court. Accordingly, the parties' motions to certify state law questions are denied.

## CONCLUSION

Based on the above reasoning, Plaintiffs Motion for Preliminary Injunction [Docket No. 8] is GRANTED; Plaintiffs' Motion to Certify Questions of Utah State Law to the Utah Supreme Court [Docket No. 10] is DENIED; and Defendants' Motion to Certify Questions of Utah State Law to the Utah Supreme Court [Docket No. 34] is DENIED. The following Preliminary Injunction Order is temporarily stayed for twenty-one (21) days to allow the State to seek an emergency stay pending appeal from the Tenth Circuit.

## PRELIMINARY INJUNCTION ORDER

The court issues the following Preliminary Injunction against Defendants:

Defendants State of Utah, Governor Gary Herbert and Attorney General Sean Reyes are prohibited from applying Utah's marriage bans retroactively to the same-sex marriages that were entered pursuant to Utah marriage licenses issued and solemnized between December 20, 2013, and January 6, 2014. Accordingly, Defendants State of Utah, Governor Gary Herbert and

---

unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *Id.* (citations omitted). Because these cases are not parallel actions, the court has no discretion to abstain and must exercise its obligation to hear and decide the case presented to it.

Attorney General Sean Reyes shall immediately recognize the marriages by same-sex couples entered pursuant to Utah marriage licenses issued and solemnized between December 20, 2013, and January 6, 2014, and afford these same-sex marriages all the protections, benefits, and responsibilities given to all marriages under Utah law.

DATED this 19th day of May, 2014.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge